UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DOMINICK R. PILLA, ARCHITECTURE-
ENGINEERING P.C., *doing business as each
of Dominick R. Pilla Associates, PC, DRPILLA
Associates, PC, DRPILLA Consulting
Engineers, and/or Dominick R. Pilla*,

                                                                    Plaintiff,

                            v.

ORLY GILAT *and* W 108 DEVELOPMENT
LLC,

                                                                    Defendants.

No. 19-CV-2255 (KMK)

OPINION & ORDER

---

Appearances:

Benjamin M. Rattner, Esq.
Michael R. Wood, Esq.
Ceremele & Wood LLP
White Plains, NY
*Counsel for Plaintiff*

James H. Rowland, Esq.
Kevin P. Mulry, Esq.
Michael S. Popok, Esq.
Hamutal Lieberman, Esq.
Farrell Fritz, P.C.
Uniondale, NY and New York, NY
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

        Plaintiff Dominick R. Pilla, Architecture-Engineering P.C. ("Plaintiff" or "DRP") brings

this Action against Orly Gilat ("Gilat") and W 108 Development LLC ("W 108"; collectively,

"Defendants"), alleging copyright infringement under 17 U.S.C. §§ 101, et seq. (the "Copyright

Act"), false designation of origin under 15 U.S.C. §§ 1051, et seq. (the "Lanham Act"), and

violations of 17 U.S.C. § 1202 (the "Digital Millennium Copyright Act," or "DMCA").  (*See* Compl. (Dkt. No. 7).)  Before the Court is Defendants' Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  (*See* Not. of Mot. (Dkt. No. 66).)  For the reasons explained herein, Defendants' Motion is granted.

I.  Background

A.  Factual Background

The following facts and procedural history are taken from the Parties' statements pursuant to Local Civil Rule 56.1, specifically Defendants' 56.1 Statement (Defs.' Local Rule 56.1 Statement ("Defs.' 56.1") (Dkt. No. 71)), Plaintiff's 56.1 Counterstatement (Pl.'s Local Rule 56.1 Counterstatement ("Pl.'s 56.1") (Dkt. No. 80)), and the admissible evidence submitted by the Parties.[1]  The facts are recounted "in the light most favorable to" Plaintiff, the non-movant.  *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 30 (2d Cir. 2018) (quotation marks omitted).  The facts as described below are in dispute only to the extent indicated.[2]

Plaintiff alleges that it is a New York-based professional corporation that provides architectural services to construction projects.  (Affidavit of Dominick Pilla ("Pilla Aff.") (Dkt. No. 79) ¶ 2.)  W 108 is a limited liability company in New York.  (Defs.' Answer to Compl. (Dkt. No. 41) ¶ 6.)  Gilat "is a member and principal of W 108."  (Defs.' 56.1 ¶ 2; Pl.'s 56.1 ¶ 2.)

---

[1] "Where possible, the Court has relied on the undisputed facts in the Parties' 56.1 submissions.  However, direct citations to the record have also been used where relevant facts were not included in any of the Parties' Rule 56.1 submissions, or where the Parties did not accurately characterize the record."  *Ocampo v. 455 Hosp. LLC*, No. 14-CV-9614, 2021 WL 4267388, at *1 n.1 (S.D.N.Y. Sept. 20, 2021).

[2] In many instances, Plaintiff did not specifically respond to Defendants' factual statements in its Rule 56.1 submissions, and "56.1 statements not explicitly denied by [P]laintiff are deemed admitted."  *Buckman v. Calyon Sec. (USA) Inc.*, 817 F. Supp. 2d 322, 328 n.42 (S.D.N.Y. 2011).

W 108 "is the owner of a building located at 324-326 W[est] 108th Street in New York City," (hereinafter, "the Building").  (Defs.' 56.1 ¶ 1; Pl.'s 56.1 ¶ 1.)  W 108 purchased the Building in 2015, intending "to renovate the existing 5-story building and convert it into a multi-unit condominium building with both private apartments and common living spaces as well as a 6th-story addition."  (Defs.' 56.1 ¶ 3; Pl.'s 56.1 ¶ 3.)  The Building "is a historical landmark subject to the building and design constraints set forth by the New York City Landmarks Preservation Commission ('LPC')."  (Defs.' 56.1 ¶ 4.)[3]  Therefore, not only are any renovations "subject to the building and design constraints set forth by the New York City Department of Buildings ('DOB') and all applicable zoning laws," (Defs.' 56.1 ¶ 8; Pl.'s 56.1 ¶ 8), but they are also subject to LPC's approval, though LPC does not set forth specific requirements for redesigns beyond public rules and regulations, (Defs.' 56.1 ¶ 4; Pl.'s 56.1 ¶ 4.).

In February 2015, W 108 "retained Plaintiff . . . to perform the architectural and engineering services for" the renovation.  (Defs.' 56.1 ¶ 11.)[4]  Thereafter, the Parties

_____

[3] Plaintiff disputes this, arguing that "[t]he [B]uilding was not designated a landmark at the time [Plaintiff] began work on the Project, but later became so designated."  (Pl.'s 56.1 ¶ 4.)  But at the time the project was to begin, the Building was "calendared" to be designated, meaning it was public knowledge that the Building was to receive such a designation imminently, and thus "had to already comply with all renovation requirements" required of landmarked buildings.  (Rowland Decl. Ex. 32 (Deposition of Orly Gilat) ("Gilat Tr.") (Dkt. No. 66-32), at 29:4–30:4.)  Because this does not bear on the factual allegations or the legal conclusions of the Court, this, too, does not create a material dispute of fact.  *See Ocampo*, 2021 WL 4267388, at *1 n.1 (collecting cases).

[4] Plaintiff also disputes this, arguing that "Gilat hired [Plaintiff] to perform work for herself and her entity, Defendant W 108 Development LLC."  (Pl.'s 56.1 ¶ 11.)  "Where the Parties identify disputed facts but with semantic objections only or by asserting irrelevant facts, which do not actually challenge the factual substance described in the relevant paragraphs, the Court will not consider them as creating disputes of fact."  *Ocampo*, 2021 WL 4267388, at *1 n.1.  Because Gilat is a principal of W 108, (Pl.'s 56.1 ¶ 2), the Court does not view this dispute as material.

communicated through meetings and iterative design reviews, during which Defendants claim to have set forth their design preferences, referred to as a "Design Program."  (*Id.* ¶¶ 10, 13.)[5]

In the course of this project, Plaintiff created multiple sets of architectural drawings, which it submitted to the United States Copyright Office (the "Copyright Office") in or around 2016 to apply to register for a copyright.  (*See* Rowland Decl. Ex. B (Copyright Registrations) (Dkt. No. 66-3).)  On September 12 and 16, 2016, the Copyright Office issued two Certificates of Copyright Registration (the "Certificates") for Plaintiff's Designs.  (*Id.*)  The Certificates state that Plaintiff is the author, "Copyright Claimant," and organization with "[r]ights and [p]ermissions" with respect to the copyrights.  (*Id.*)

Plaintiff began to implement its plans for renovating the Building, but in May 2016, Defendants terminated Plaintiff.  (Defs.' 56.1 ¶ 16; Pl.'s 56.1 ¶ 16 (admitting that DRP was terminated).)  Thereafter, Defendants retained the architectural firm Oaklander, Coogan & Vito PC ("OCV").  (Defs.' 56.1 ¶ 17; Pl.'s 56.1 ¶ 17.)  Upon hiring OCV, Defendants communicated an identical Design Program to OCV as it had to Plaintiff.  (Defs.' 56.1 ¶ 18; Pl.'s 56.1 ¶ 18.)  Additionally, Defendants passed Plaintiff's drawings to OCV and sought to determine whether anything was "salvageable" from Plaintiff's plans.  (Pl.'s 56.1 ¶ 19.)

---

[5] Plaintiff disputes Defendants' characterization of both the Design Program as well as the way in which it was communicated, referring to the design process as "iterative . . . with continual discussion with Gilat and W 108," (Pl.'s 56.1 ¶ 13).  So, too, does Plaintiff claim that there was no "specific directives from [Defendants] as to its supposed 'Design Program.'"  (*Id.*)  In the first instance, this contention is not internally consistent with Plaintiff's own concessions, as Plaintiff admitted that the Design Program's preferences and "requirements that were initially communicated to [Plaintiff] were also communicated to OCV."  (*Id.* ¶ 18.)  More importantly, however, regardless of whether there were specific meetings focused on the design features, the thrust of this fact is that there was an overall Design Program communicated to Plaintiff, a fact Plaintiff conceded in his deposition.  (*See* Rattner Decl. Ex. 4 (Deposition of Dominick Pilla) ("Pilla Tr.") (Dkt. No. 77-4), at 187:7–21.)  Thus, this Court will not view this dispute as raising a material fact.  *See Ocampo*, 2021 WL 4267388, at *1 n.1.

In approximately December 2017, Plaintiff alleges that Defendants submitted design plans to DOB, including a "cover sheet drawing list and accompanying [blue]prints." (Decl. of James Rowland ("Rowland Decl.") (Dkt. No. 66-1) Ex. A (Compl.) ¶¶ 20, 30 (Dkt. No. 66-2).) After making this submission, Defendants continued to work on the Building's renovation with OCV.

B.  Procedural History

On March 12, 2019, Plaintiff filed the Complaint, (Dkt. No. 1), which was subsequently re-filed the following day due to filing issues, (Dkt. No. 7). Defendants submitted their Motion To Dismiss on August 22, 2019. (Not. of Mot. (Dkt. No. 22).) Following briefing by both Parties, (*see* Dkt. Nos. 26–29), on March 19, 2020, the Court granted in part and denied in part Defendants' Motion To Dismiss, (*see generally* Opinion & Order ("Op.") (Dkt. No. 36)). Specifically, the Court dismissed Plaintiff's Lanham Act claim without prejudice but denied Defendants' Motion To Dismiss with respect to Plaintiff's claims under the Copyright Act and the DMCA. (*See id.* at 31.) The Court allowed Plaintiff 30 days to amend its complaint. (*See id.* at 32.) Plaintiff did not amend the Complaint, and the litigation proceeded as such.

Nearly a month after the Court's decision, on April 28, 2020, Plaintiff submitted a demand for a jury trial. (*See* Dkt. No. 39.) Thereafter, Defendants filed an Answer to Plaintiff's Complaint. (*See* Dkt. No. 41.) The Parties subsequently proceeded with discovery.

On June 11, 2021, Defendants filed the instant Motion alongside accompanying papers and exhibits as well as a Rule 56.1 Statement. (*See* Not. of Mot.; Affidavit of Orly Gilat ("Gilat Aff.") (Dkt. No. 67); Affidavit of John Coogan ("Coogan Aff.") (Dkt. No. 68); Affidavit of Page Cowley ("Cowley Aff.") (Dkt. No. 69); Defs.' Mem. of Law in Supp. of Mot. ("Defs.' Mem.") (Dkt. No. 70); Defs.' 56.1.) After receiving an extension, (*see* Dkt. No. 75), Plaintiff filed its

response to the Motion on July 30, 2021, (*see* Pl.'s Mem. of Law in Opp'n to Mot. ("Pl.'s

Mem.") (Dkt. No. 76); Declaration of Benjamin Rattner ("Rattner Decl.") (Dkt. No. 77);

Affidavit of Ron Czajka ("Czajka Aff.") (Dkt. No. 78); Pilla Aff.; Pl.'s 56.1).  On August 20,

2021, Defendants filed their Reply Memorandum of Law in Support of their Motion for

Summary Judgment.  (*See* Defs.' Reply Mem. of Law. in Supp. of Mot. for Summ. J. ("Defs.'

Reply Mem.") (Dkt. No. 81).)

 Following this briefing, the Court issued a short order on December 12, 2021, instructing

the Parties to submit supplemental briefing "as to which building codes, if any, obviate copyright

protections for each aspect of the allegedly infringed upon designs" by January 7, 2022.  (Dkt.

No. 82.)  Both Parties submitted timely letters in response thereto.  (*See* Pl.'s Suppl. Ltr. (Dkt.

No. 83); Defs.' Suppl. Ltr. (Dkt. No. 84).)

## II.  Discussion

### A.  Standard of Review

 Summary judgment is appropriate where the movant shows that "there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (same); *Psihoyos v.

John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same).  "In determining whether

summary judgment is appropriate," a court must "construe the facts in the light most favorable to

the non-moving party and . . . resolve all ambiguities and draw all reasonable inferences against

the movant."  *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quotation marks omitted);

*see also Borough of Upper Saddle River v. Rockland Cnty. Sewer Dist. No. 1*, 16 F. Supp. 3d

294, 314 (S.D.N.Y. 2014) (same).  "It is the movant's burden to show that no genuine factual

dispute exists." *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004);

*see also Berry v. Marchinkowski*, 137 F. Supp. 3d 495, 521 (S.D.N.Y. 2015) (same).

"However, when the burden of proof at trial would fall on the non[-]moving party, it

ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an

essential element of the non[-]movant's claim," in which case "the non[-]moving party must

come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order

to avoid summary judgment." *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d

114, 123 (2d Cir. 2013) (alteration and quotation marks omitted).  Further, "[t]o survive a

[summary judgment] motion, [a non-movant] need[s] to create more than a 'metaphysical'

possibility that [her] allegations were correct; [s]he need[s] to 'come forward with specific facts

showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d

Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475

U.S. 574, 586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the

pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014)

(quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a

motion for summary judgment is properly supported by documents or other evidentiary

materials, the party opposing summary judgment may not merely rest on the allegations or

denials of his pleading . . . . ").

"On a motion for summary judgment, a fact is material if it might affect the outcome of

the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental

Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (quotation marks omitted).  At this stage, "[t]he role

of the court is not to resolve disputed issues of fact but to assess whether there are any factual

issues to be tried." *Brod*, 653 F.3d at 164 (citation omitted).  Thus, a court's goal should be "to

isolate and dispose of factually unsupported claims." *Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (quoting *Celotex*, 477 U.S. at 323–24).  However, a district court should consider only evidence that would be admissible at trial.  *See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998).  "[W]here a party relies on affidavits . . . to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated.'"  *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4)); *see also Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 643 (2d Cir. 1988) ("Rule 56 requires a motion for summary judgment to be supported with affidavits based on personal knowledge . . . ."); *Baity v. Kralik*, 51 F. Supp. 3d 414, 419 (S.D.N.Y. 2014) (disregarding "statements not based on [the] [p]laintiff's personal knowledge"); *Flaherty v. Filardi*, No. 03-CV-2167, 2007 WL 163112, at *5 (S.D.N.Y. Jan. 24, 2007) ("The test for admissibility is whether a reasonable trier of fact could believe the witness had personal knowledge." (citation omitted)).

    B.  Analysis

        1.  Copyright Infringement Claim

"The owner of a copyright has the exclusive right to—or to license others to—reproduce, perform publicly, display publicly, prepare derivative works of, and distribute copies of, his copyrighted work."  *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 117 (2d Cir. 2010) (citing 17 U.S.C. § 106).  "A party who violates the exclusive rights of the copyright owner is an infringer, liable for damages pursuant to 17 U.S.C. § 504."  *Warren v. John Wiley & Sons, Inc.*, 952 F. Supp. 2d 610, 616 (S.D.N.Y. 2013).

"In order to make out a claim of copyright infringement for an architectural work—or any work—a plaintiff must establish three things: [(]1) that his work is protected by a valid copyright, [(]2) that the defendant copied his work, and [(]3) that the copying was wrongful." *Zalewski v. Cicero Builder Dev., Inc.*, 754 F.3d 95, 100 (2d Cir. 2014).  When "a substantial similarity exists between the defendant's work and the protect[a]ble elements of [the] plaintiff's" work, copying is wrongful and the third element of a copyright infringement claim is automatically met.  *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 63 (2d Cir. 2010) (quotation marks omitted) (quoting *Hamil Am. Inc. v. GFI*, 193 F.3d 92, 99 (2d Cir. 1999)).  As the Court recognized in its Opinion on Defendants' Motion To Dismiss, "it is undisputed that Plaintiff possessed valid copyrights."  (Op. 12.)  Rather, Defendants challenge the extent to which Plaintiff's copyright is protectable as well as whether the designs are, in fact, substantially similar.  (*See generally* Defs.' Mem.; Defs.' Reply Mem.; Defs.' Suppl. Ltr.)

"To determine whether two works are substantially similar—and thus whether any copying was wrongful—[courts] usually apply the ordinary observer test and ask whether the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard their aesthetic appeal as the same."  *Zalewski*, 754 F.3d at 102 (quotation marks omitted); *see also Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 111 (2d Cir. 2001) ("The standard test for substantial similarity between two items is whether an ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard the aesthetic appeal as the same."  (alteration and quotation marks omitted)).  This test, at its core, asks "whether an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work."  *Peter F. Gaito*, 602 F.3d at 66 (quotation marks omitted).

The test, however, is difficult to apply for several reasons, both in general and specifically in the context of architectural design copyrights.  First, "[t]he test . . . is of necessity vague," *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.*, 274 F.2d 487, 489 (2d Cir. 1960), and "[t]he determination of the extent of similarity that will constitute a *substantial*, and hence infringing, similarity presents one of the most difficult questions in copyright law, and one that is the least susceptible of helpful generalizations," *Peter F. Gaito*, 602 F.3d at 63 (alteration and emphasis in original) (quoting 4 Nimmer on Copyright § 13.03 (2009)); *see also Durham Indus., Inc. v. Tomy Corp.*, 630 F.2d 905, 911 (2d Cir. 1980) ("[T]he question of infringement is generally resolved by the fact-finder's prediction of the probable reaction of a hypothetical 'ordinary observer.'").

Second, it is often the case that "a work's aesthetic appeal will be due largely to unprotected elements."  *Zalewski*, 754 F.3d at 102.  As the Court stated in its prior opinion, the Second Circuit made clear in *Zalewski* that there are a number of architectural features or aspects that are unprotectable, including:

> (1) "market expectations," *id.* at 105; (2) "[a]ny design elements attributable to building codes, topography, structures that already exist on the construction site, or engineering necessity," *id.*; (3) "generalized notions of where to place functional elements, how to route the flow of traffic, and . . . methods of construction," *id.* at 106 (omission in original); (4) design parameters, defined as "[c]onstraints placed on an architect by the way her client plans to use the building," *id.*; and (5) "elements taken from [recognized] styles," such as "[n]eoclassical government buildings, colonial houses, and modern high-rise office buildings," *id.* at 105.  In addition, "[s]tandard configurations of spaces" and "individual standard features, such as windows, doors, and other staple building components" are unprotectable. 37 C.F.R. § 202.11(d)(2).

(Op. 15–16.)  Indeed, this list embodies the notion that "[t]he problem of distinguishing an idea from its expression is particularly acute when the work of 'authorship' is of a functional nature, as is a plan for the accomplishment of an architectural or engineering project."  *Attia v. Soc'y of*

*N.Y. Hosp.*, 201 F.3d 50, 55 (2d Cir. 1999), *cert. denied*, 531 U.S. 843 (2000).  Thus, said

succinctly, protectable elements are those beyond pure functional elements that were

independently created by the author and possess a "minimal degree of creativity."  *Belair v.*

*MGA Entm't*, 831 F. Supp. 2d 687, 692 (S.D.N.Y. 2011) (quotation marks omitted), *aff'd*, 503 F.

App'x 65 (2d Cir. 2012).  "[T]he requisite level of creativity is extremely low; even a slight

amount will suffice.  The vast majority of works make the grade quite easily, as they possess

some creative spark, no matter how crude, humble, or obvious it might be."  *Feist Publ'ns, Inc.*

*v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345 (1991) (quotation marks omitted).

Therefore, when a court adjudicates a copyright infringement claim in which the

copyrighted work in question contains both protectable and unprotectable elements, the Court's

analysis must be "more discerning," *Fisher-Price, Inc. v. Well-Made Toy Mfg. Corp.*, 25 F.3d

119, 123 (2d Cir. 1994) (quotation marks omitted), *abrogated on other grounds by Salinger v.*

*Colting*, 607 F.3d 68, 77 (2d Cir. 2010), as the Court "must attempt to extract the unprotect[a]ble

elements from . . . consideration and ask whether the protect[a]ble elements, standing alone, are

substantially similar," *Knitwaves, Inc. v. Lollytogs Ltd. (Inc.)*, 71 F.3d 996, 1002 (2d Cir. 1995)

(emphasis omitted).  Neither Party disputes the general notion that the copyrights in question

could, in theory, enjoy both protectable and unprotectable elements.  Accordingly, the Court's

analysis must be precise and deliberate to determine each element's protectability and,

subsequently—if necessary—similarity to its uncopyrighted counterpart.

Third, though a copyrighted work may include certain unprotectable items, courts are not

"required to dissect the works into their separate components and compare only those elements

which are in themselves copyrightable."  *Peter F. Gaito*, 602 F.3d at 66 (alteration, and quotation

marks omitted).  Instead, the Court's inquiry is "guided by comparing the contested design's

total concept and overall feel with that of the allegedly infringed work, as instructed by [its] good eyes and common sense." *Id.* (citations and quotation marks omitted). This is the appropriate frame of reference because a "defendant may infringe on the plaintiff's work not only through literal copying of a portion of it, but also by parroting properties that are apparent only when numerous aesthetic decisions embodied in the plaintiff's work of art . . . are considered in relation to one another." *Tufenkian Imp./Exp. Ventures, Inc. v. Einstein Moomjy, Inc.*, 338 F.3d 127, 134 (2d Cir. 2003). For that reason, a work may be copyrightable—and therefore may be infringed upon—even if said work is only a compilation of unprotectable elements. *See Feist*, 499 U.S. at 350–51. In short, a court's "inquiry necessarily focuses on whether the alleged infringer has misappropriated the original way in which the author has selected, coordinated, and arranged the elements of his or her work" in addition to the constituent elements themselves. *Peter F. Gaito*, 602 F.3d at 66 (quotation marks omitted). Therefore, courts must compare parallel constituent elements as well as overall concepts such elements comprise.

Given the detailed, fact-specific inquiry that this test demands, and "[b]ecause substantial similarity is customarily an extremely close question of fact, summary judgment has traditionally been frowned upon in copyright litigation." *de Becdelievre v. Anastasia Musical LLC*, No. 16-CV-9471, 2018 WL 1633769, at *6 (S.D.N.Y. Apr. 2, 2018) (alteration in original) (quoting *Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972, 977 (2d Cir. 1980)) (collecting cases). But that is not to say courts should never do so; to the contrary, the Second Circuit long ago established that "[t]he question of substantial similarity is by no means exclusively reserved for resolution by a jury." *Peter F. Gaito*, 602 F.3d at 63; *see also Walker v. Time Life Films, Inc.,* 784 F.2d 44, 48 (2d Cir. 1986) ("[A] district court may determine noninfringement as a matter of law on a motion for summary judgment either when the similarity concerns only

noncopyrightable elements of plaintiff work, or when no reasonable trier of fact could find the works substantially similar."); *Warner Bros. Inc. v. Am. Broad. Cos.,* 720 F.2d 231, 240 (2d Cir. 1983) ("[A] court may determine non-infringement as a matter of law on a motion for summary judgment, either because the similarity between two works concerns only non-copyrightable elements of the plaintiff's work or because no reasonable jury, properly instructed, could find that the two works are substantially similar." (emphasis, quotation marks, and citation omitted)); *Durham*, 630 F.2d at 918 ("Although the issue of substantial similarity is clearly a factual one, it was entirely proper for [the district court] to hold that [the defendant] is not entitled to go to trial on the issue of infringement.").

Thus, upon motions for summary judgment in copyright infringement litigation, courts must roll up their proverbial sleeves and undertake a painstaking review of the relevant materials to determine whether the copyrighted materials are protectable and, if so, whether they are substantially similar to the allegedly infringing materials.  The Court does so here, reviewing in turn the different elements of the design that Plaintiff alleges were copied, both individually and as a whole.

### a.  The Core Elements

Plaintiff asserts that its "copyright infringement claim relating to the Building core derives from the selection and arrangement of scissor stairs, elevator, and the other core elements."  (Pl.'s Mem. 5 (citing Pilla Tr. 196:7–22).)  As such, the Court begins its infringement inquiry with those core elements.

Defendants argue that the layout and design of the Building's core elements are not protectable, as the choices regarding these features—both location and substantive design—were dictated by "structural limitations and functionality concerns that are typically encountered

during the renovation of existing buildings," (Defs.' Mem. 10 (quoting Coogan Aff. ¶ 11)), as well as by architectural efficiency, itself related to Defendants' request of OCV "that the apartments benefit from a maximum of natural light and exposure to the outdoors through balconies and terraces," (*id.* (quoting Coogan Aff. ¶ 12)).  Plaintiff cursorily disputes this and instead immediately pivots to the assertion that the design of the core elements, namely the hallway, the elevator, and the stairs, are substantially similar.  (Pl.'s Mem. 5.)  Specifically, Plaintiff avers, quoting its expert, that "OCV's plans follow DRP's parti and express it nearly identically."  (*Id.* (quoting Czajka Aff. Ex. 3 ("Czajka Report") § A.1.3).)[6]  For three interwoven but independent reasons, Defendants are correct that these elements cannot be afforded copyright protection.

First, as Defendants' expert notes, "the decision to place these required building elements in the center of the [B]uilding is standard in construction and was based on NYC Building Code requirements."  (Cowley Aff. ¶ 14.)  In their supplemental briefing on the topic, Defendants persuasively expound on this idea.  With respect to the scissor stairs, Defendants explain:

> NYC [Building] Code § 1007.1 provides that 2 exits are required from each story with at least one being handicap accessible. To satisfy the means of egress requirements, the doors to each staircase of the scissor stairs had to be no less than 15 feet apart (NYC [Building] Code § 1015.2.1) and the elevator (accessible means of egress) had to be connected to the lobby as NYC [Building] Code § 1027.1 requires that all exits discharge into the exterior of the building. Since the front entrance to the [B]uilding is on the north side, the building lobby could only be located on the north side of the [B]uilding.  In addition, the requirement that the doors to each staircase be no more than 15 feet apart necessitated the north to south orientation of the scissor stairs.

---

[6] A "parti," as Plaintiff's expert explains, is "a French word, meaning a diagram that distills the complexities of a building into simple expression, usually in the form of a sketch.  It takes programmatic elements, the form, the circulation and distills them to a simple diagram.  In other words, it is a sketch that holds the concept of the building."  (Czajka Report 3 § A.1.)

(Defs.' Suppl. Ltr. 1 (hyperlinks omitted).)  In reviewing OCV's design of the stairs, (*see* Rattner Decl. Ex. 3 (OCV's Dec. 2017 Plans) ("OCV's Plans"), at 6–13 (Dkt. No. 77-3)), and its clear compliance with this regulatory regime, the Court agrees with Defendants, and finds that the design of the stairs themselves were heavily influenced by relevant NYC Building Codes.

The same is true for the elevator.  As Defendants again explain:

[S]ince the renovated building was to be five floors or higher, an elevator was required to be installed pursuant to NYC Code [New York City Building Code] § 3002.4 as such a design to include an elevator was not unique, rather it was required.  Since the [B]uilding was landmarked, the elevator could not be attached to either the north (front) or south (rear) of the building as it would impact the existing historic openings for windows and doors situated along the north and south exterior-facing walls of the property. The placement of the elevator along the either the east or west wall would have required underpinning of the foundation walls of the neighboring buildings per NYC Code § 3309.4, which cannot be done without the express permission of the neighboring owners (*Matter of Broadway Enters. Inc. v. Lum*, 16 A.D.3d 413 (2d Dept., 2005) (underpinning performed without permission is a trespass)). Since the elevator could not be placed on the north and south wall and required permission to underpin from one of the neighbors, the only location to place the elevator was in the center of the [B]uilding.

The NYC ZR [Zoning Resolution] and RCNY [Rules of the City of New York, Landmark Preservation Commission] requirements concerning the location of the elevator shaft roof bulkhead also dictated the elevator location. NYC ZR 23-62(g)(1) requires that elevator and stair bulkheads be located not less than 10 feet from the street wall of a building and NYC ZR 23-662 (c)(1) requires that the bulkhead be at least 15 feet from the front wall where the building is located on a narrow street.

(Defs.' Suppl. Ltr. 1–2 (hyperlinks omitted).)  Again, even a cursory review of OCV's designs, which include the elevator, in the context of this regulatory atmosphere buttresses Defendants' contention that the elevator's design is the result of these regulations.

As the Second Circuit has made clear, design choices "attributable to building codes . . . should [] get no protection."  *Zalewski*, 754 F.3d at 105.  Courts around the country have also recognized this idea.  *See, e.g.*, *YS Built, LLC v. Ya Hsing Chiang Huang*, 224 F. Supp. 3d 1149, 1154 (W.D. Wash. 2016) (granting judgment for defendant-architect on copyright

infringement claims after finding that the "footprint drawn into the" at-issue building plan was "a functional one informed by building codes and the unusual topography of the lot"), *aff'd sub nom. YS Built LLC v. Ya Hsing Chiang Cind Huang*, 739 F. App'x 414 (9th Cir. 2018); *Dream Custom Homes, Inc. v. Modern Day Constr., Inc.*, 773 F. Supp. 2d 1288, 1300 (M.D. Fla. 2011) ("Constraints on protectable expression in architectural works include the merger doctrine, market demands, building codes and zoning requirements, functional demands, the physical site and environment, budgetary constraints and available technology."), *aff'd*, 476 F. App'x 190 (11th Cir. 2012); *Harvester, Inc. v. Rule Joy Trammell + Rubio, LLC*, 716 F. Supp. 2d 428, 441 (E.D. Va. 2010) (holding that "any decisions on arrangement and coordination made by [an architect] that were dictated by the building code and manufacturers' clearance directives cannot be protected expression, as they would not be original to [that architect]."). Defendants' explanations as well as the designs themselves provide ample justification for the finding that the core elements' designs are beyond copyright protection for sake of regulatory attribution alone.

Second, design choices made pursuant to a client request cannot be protected. "Design features used by all architects, because of consumer demand . . . get no protection." *Zalewski*, 754 F.3d at 105; *see also id.* at 106 ("[The] [p]laintiff can get no credit for putting a closet in every bedroom, a fireplace in the middle of an exterior wall, and kitchen counters against the kitchen walls."); *accord Design Basics, LLC v. Lexington Homes, Inc.*, 858 F.3d 1093, 1101 (7th Cir. 2017) ("The challenge of proving substantial similarity is heightened where the field is crowded or where aesthetic choices may be secondary to consumer demands or functional requirements.").

As Defendants persuasively argue, "the location of the building core was also driven by W 108 and Gilat's design preference that the apartments benefit from a maximum of natural light

and exposure to the outdoors through balconies and terraces." (Defs.' Mem. 10 (quotation marks omitted).) This preference, OCV's principal architect stated, could "*only be achieved* by placing the vertical circulation Core"—namely, the elevator, hallway, and stairs—in the way that OCV did. (Coogan Aff. ¶ 12 (emphasis added).) In other words, while it may have been possible to create other layouts that would have been approved, these purported alternatives would have gone against Defendants' explicit wish to "maximize the livable area," (Gilat Tr. 18:10), a wish communicated identically to both Plaintiff and OCV, (*see* Defs.' 56.1 ¶ 18; Pl.'s 56.1 ¶ 18).

Moreover, in this case, Defendants demanded that the project remain under a strict budget. (Coogan Aff. ¶ 10.) As Defendants' expert makes clear, the purportedly viable alternative placements of these core elements—specifically the elevator—"would have resulted in expensive, complex[,] and unnecessary structural work on the neighboring buildings." (Cowley Aff. ¶ 16.) Because "New York City Building Code requires the performance of underpinning the level of the foundations of the adjoining structure is at, or above, the level of the bottom of the new excavation," placing the elevator "in the center of the already connected buildings and away from the neighbor's party walls" allowed Defendants to "avoid underpinning or other engineering methods to support the neighboring properties." (*Id.*; *cf.* Defs.' Suppl. Ltr. 2 ("The center of the roof also happened to be the lowest part of the roof (3 feet lower than the adjacent neighbor) making it easier to comply with above restrictions." (citation and hyperlink omitted)).) Therefore, to the extent that the placement of the "paramount" features of Plaintiff's copyright claim, (Pilla Tr. 194:20), was not dictated by regulations or the request to maximize living area, it was dictated budgetary considerations, which also places it beyond the reach of copyright law's shield, *see Zalewski*, 754 F.3d at 105.

Third, "[e]fficiency is an important architectural concern," *id.*, and "efficiency[-]driven industry standards are not susceptible to copyright," *Home Design Servs., Inc. v. Turner Heritage Homes Inc.*, 825 F.3d 1314, 1324 (11th Cir. 2016) (citing *Zalewski*, 754 F.3d at 105).  Plainly, the core elements, particularly the stairs, were located and designed in such a way as to maximize livable space.  "[U]tilizing a scissor[-]stairs design instead of two separate staircases is a much more efficient use of space and is a standard configuration used in construction and design, especially in the instances, as here, where the Building is longer than it is wide." (Cowley Aff. ¶ 15.)  Plaintiff even concedes that scissor stairs are "an efficient use of space." (Pl.'s Mem. 17 n.7.)  This, too, disqualifies granting any copyright protections to Plaintiff for sake of the design and placement of the core elements.

In sum, Defendants have established that the core elements are indeed the result of regulations, consumer demands (including substantive and budgetary constraints), and efficiency, thereby precluding a finding that these elements are copyrightable.

Plaintiff does not dispute any of these arguments head-on.  Rather, as alluded to above, Plaintiff argues that because "[a]lternate layouts for the egress stair could have resulted in successful architectural plan sets," (Pl.'s Mem. 16–17 (quoting Czajka Report § A.1.3)), including placing the stairs "on either side of the Building's interior abutting party walls," (*id.* at 17 (citing Pilla Aff. ¶ 4)), the layout of the interior's core elements is unprotectable.  In support of this argument, Plaintiff relies on two other non-binding cases from outside the Second Circuit that Plaintiff asserts suggest that the designs and features of a stairway placement may be protectable.  (*See id.* at 16–17 (first citing *T-Peg, Inc. v. Vt. Timber Works, Inc.*, 459 F.3d 97, 113, 114 (1st Cir. 2006); then citing *Frank Betz Assocs. v. Signature Homes, Inc.*, No. 06-CV-0911, 2009 WL 2151304, at *32–36 (M.D. Tenn. July 13, 2009)).)

Again, while technically true that other designs may have been viable, this argument—and the cases cited in support thereof—fail to discount the other influences of the design choice, namely the aforementioned regulatory concerns. Indeed, the designs at issue in the cases Plaintiff cite concern freestanding buildings not subject to similar regulatory regimes. *See T-Peg*, 459 F.3d at 101 (describing the architectural designs at issue as freestanding "timberframed homes" not covered by analogous aesthetic regulations); *Frank Betz*, 2009 WL 2151304, at *1 (describing the allegedly infringed upon plans as similarly freestanding "stock single-family home plan designs" similarly unencumbered from strict aesthetic regulatory requirements). And, in any event, "[a]n inquiry into the substantial similarity between a copyrighted work and the allegedly infringing work must be made on a case-by-case basis, as there are no bright-line rules for what constitutes substantial similarity." *TufAmerica, Inc. v. Diamond*, 968 F. Supp. 2d 588, 596 (S.D.N.Y. 2013) (quoting *Sandoval v. New Line Cinema Corp.*, 147 F.3d 215, 217 (2d Cir. 1998)). Thus, even if the cases Plaintiff cites were binding—and they are not, *see Barton v. Ne. Transp., Inc.*, No. 21-CV-326, 2022 WL 203593, at *11 (S.D.N.Y. Jan. 24, 2022) ("[I]t is an axiomatic principle of American jurisprudence that district courts are 'bound by the decisions of the Supreme Court of the United States and those of the Circuit Court of Appeals in their own circuit, but are not bound by those of a federal court of co-ordinate jurisdiction, or even the decisions of a federal Circuit Court of Appeals in another circuit.'" (quoting *Cont'l Sec. Co. v. Interborough Rapid Transit Co.*, 165 F. 945, 959–60 (S.D.N.Y. 1908)))—the cases would nonetheless be inapposite. At bottom, while stairs or elevators may be protectable in some circumstances, in this case, where they were specifically designed to accommodate the numerous particular influences at play, they cannot be considered protectable.

19

Similarly, Plaintiff's supplemental briefing fails to convince the Court that these elements were not "attributable" to regulatory, client, cost, or efficiency considerations.  Plaintiff's supplemental letter states, in broad strokes, that "there are no specific Code Provisions" for particular elements, like that scissor stairs must be at the center of the building.  (Pl.'s Suppl. Ltr. 1.)  Defendants' explanation of the various code provisions that, in concert, necessitated these decisions, however, fully undermines this assertion.

Given the animating factors leading both Plaintiff and OCV to make their design choices with regard to the core elements, the Court concludes that "the similarity between [the] two works"—to the extent it exists—"concerns only non-copyrightable elements of [P]laintiff's work," meaning said elements cannot be afforded protection against copyright infringement and summary judgment should be determined as a matter of law in favor of Defendants.  *Warner Bros.*, 720 F.2d at 240.

### b.  Living Spaces as a Whole, Including the Sixth Floor Addition and Rooftop, Incorporating Core Elements

The Court next turns to the holistic design of the living spaces, incorporating but not limited to the core elements placement.  Defendants, in their supplemental letter regarding the influence of regulations and rules in the design, do not rely heavily on rules or regulations to dictate the holistic interior layouts.  (*See generally* Defs.' Suppl. Ltr.)  Rather, Defendants' argument with respect to the living spaces as a whole is that "[t]here is no dispute of material fact that the layouts of the apartments and common spaces within the building are very different in the OCV Plans versus [Plaintiff's] Plans."  (Defs.' Mem. 9; *see also* Defs.' Reply Mem. 4.) Plaintiff claims that such a "contention is just plain wrong," pointing not only to the aforementioned core interior elements as leading to imitated interior layouts, but also that "a material factual dispute exists about the degree of similarity in the arrangement of living rooms,

20

bedrooms, kitchens, baths, and closets on every floor." (Pl.'s Mem. 18.) Upon reviewing the floor plans for each interior floor as well as the rooftop, the Court finds that Defendants are indisputably correct. The Court finds that the floorplan is not protectable, but even if the Court were to assume otherwise for sake of argument, no reasonable juror could conclude that the layouts are substantially similar.

At the outset, the lens with which the Court undertakes this substantial similarity inquiry must be made clear. Courts have recognized that where there exists a "limited scope of protectable expression in an architectural plan . . . 'modest dissimilarities are more significant than they may be in other types of art works.'" *Miller's Ale House, Inc. v. Boynton Carolina Ale House, LLC*, 702 F.3d 1312, 1326 (11th Cir. 2012) (quoting *Howard v. Sterchi*, 974 F.2d 1272, 1276 (11th Cir. 1992)); *see also Zalewski*, 754 F.3d at 107 (describing the protections afforded to architectural drawings by copyright as "very thin," and stating "[o]nly very close copying" would rise to the level of infringement); *Design Basics*, 858 F.3d at 1101 (citing *Zalewski* and holding that "the designer's or architect's copyright [is] thin, so that only very close copying of protected elements is actionable"); *Thomson v. HMC Grp.*, No. 13-CV-3273, 2015 WL 11256775, at *12 (C.D. Cal. Oct. 29, 2015) (adopting the standard set forth in *Howard*); *N. Forest Dev., LLC v. Walden Ave. Realty Assocs., LLC*, No. 06-CV-378, 2009 WL 5959961, at *5 (W.D.N.Y. July 22, 2009) ("[T]here are only a finite number of ways a rectangle can be divided . . . . In architectural plans of this type, modest dissimilarities are more significant than they may be in other types of art works." (quoting *Home Design Servs., Inc. v. David Weekley Homes, LLC*, 548 F. Supp. 2d 1306, 1313 (M.D. Fla. 2008))), *report and recommendation adopted*, 2010 WL 741992 (W.D.N.Y. Feb. 26, 2010). Thus, the Court examines the sets of drawings with an

understanding of the slightly outsized importance of these dissimilarities in its substantial similarity calculus.

### i.  Copyright Protections

The floor plans cannot be safeguarded by copyright protections for the same reasons stated above, namely that they are the result of general consumer demands, particular client demands, regulatory regimes, or other external factors.  *See Zalewski*, 754 F.3d at 105.

Some of the allegedly infringed upon copyrights in the broader layout were the result of a client request, which cannot be protected.  *See id*.  For example, in his deposition, Pilla cited the use of balconies on multiple floors as having improperly infringed upon Plaintiff's copyrighted designs; to that end, Pilla said, OCV "didn't have to put balconies."  (Pilla Tr. 207:11.)  However, in the very next question he was asked, Pilla conceded that the inclusion of balconies was the result of Gilat's expressed wishes.  (*Id.* at 207:13–15.)  The same is true with regard to the rooftop, where Czajka's undetailed comparison comes closest to demonstrating a similarity on the rooftop designs, namely both designs show a C-shaped common space.  (Czajka Report App'x B.)  But Gilat plainly expressed a desire for a rooftop.  (Gilat Tr. 38:4–41:7.)

Plaintiff also cited the use of a rooftop garden as having infringed upon Plaintiff's copyrighted designs.  (Pl.'s Mem. 22–23.)  While Gilat conceded that Plaintiff came up with the location of the garden, (Gilat Tr. 40:19–22), Plaintiff expressly concedes that "Defendants requested a rooftop garden," (Pl.'s Mem. 22).  This alone vitiates the protection.  Moreover, OCV did not ultimately include a rooftop garden in its design; rather, the space in the same

general area was an extension of the terrace. (*See* OCV's Plans 13; *see also* Cowley Aff. Ex. A ("Cowley Report"), at 23 (Dkt. No. 73-1).)[7]

Yet another example is Plaintiff's assertion that the sixth-floor addition, beyond its layout, was substantially similar due to its "size and shape." (Pl.'s Mem. 8.) This, too, can be explained by the constraints of regulatory regimes as well as Gilat's requests. With regard to the former, the Landmarks Commission rules require that any addition on the sixth floor was not permitted to be "visible from West 108th Street and Riverside Drive, thereby limiting [its] size and location on the roof." (Cowley Aff. ¶ 10; *see also* Defs.' Suppl. Ltr. 3 (citing LPC Rules 2-15(b), (c)).) Additionally, Gilat demanded that both Plaintiff and OCV maximize usable, livable space when designing the renovation, (Defs.' 56.1 ¶ 18; Pl.'s 56.1 ¶ 18), which explains both architects' efforts to squeeze every inch possible out of the new addition.

Finally, any remaining purported similarities are simply the natural result of other generalized functional design elements and, thus, unprotectable. The Second Circuit has repeatedly affirmed the idea that "generalized notions of where to place functional elements" are unprotectable. *Attia*, 201 F.3d at 55. So, too, have other courts. *See Harvester*, 716 F. Supp. 2d at 441 (stating that "[t]he legislative history [of the Copyright Act] makes clear that functionally-required design components do not receive copyright protection under § 102(a)(8)," and concluding that the "arrangement and coordination decisions in [the plaintiff's] [a]rchitectural [d]rawings that were dictated by functional considerations" accordingly "cannot be protected

---

[7] Moreover, OCV's designs maximized living space, per Gilat's request, thereby utilizing the entire rooftop save for the necessary mechanical area, which is itself located differently in OCV's designs. (*Compare* OCV's Plans 13 (OCV's roof design) *with* Rattner Decl. Ex. 2 (Plaintiff's Feb. 2016 Interior Plans) ("Plaintiff's Interior Plans") (Dkt. No. 77-2), at 6 (showing Plaintiff's roof design); *see also* Cowley Report 23 (showing different sizes of mechanical areas).)

expression"); *Small v. Exhibit Enters., Inc.*, 364 F. Supp. 2d 648, 652 (E.D. Mich. 2005) ("In cases that involve a functional object, it is necessary to eliminate those elements dictated by efficiency."). Some of Plaintiff's claimed similarities fall under this umbrella and thus cannot be afforded copyright protections. For example, Plaintiff cited "door locations, front and back," as having been copied. (Pilla Tr. 221:3–4.) Though the door locations are similarly placed, (*compare* Plaintiff's Interior Plans 2 *with* OCV's Plans 7), door locations flow naturally from the design of hallways and egress requirements. Thus, door locations, in this instance, are more appropriately considered functional elements that cannot be subject to copyright protections. *See Zalewski*, 754 F.3d at 106 (holding that architects and designers "get no credit for putting a closet in every bedroom, a fireplace in the middle of an exterior wall, and kitchen counters against the kitchen walls").

In sum, that both designers landed on similar designs to realize an identical Design Plan amidst identical regulatory constraints is unsurprising. As such, the Court finds that the living spaces' floor plan designs are not copyrightable.

### ii.  Substantial Similarity Inquiry

Even if the Court were to assume arguendo that some portions of the living spaces' designs were protected, when "comparing the contested design's total concept and overall feel with that of the allegedly infringed work" as the Court must, *Peter F. Gaito*, 602 F.3d at 66 (quotation marks omitted) (quoting *Tufenkian*, 338 F.3d at 133), the Court finds that Plaintiff's designs are not substantially similar to OCV's designs. There exist many marked differences for the floors' designs such that "an average lay observer would [not] recognize the alleged copy as having been appropriated from the copyrighted work," *Andy Warhol Found. for Visual Arts, Inc. v. Goldsmith*, 11 F.4th 26, 53 (2d Cir. 2021) (quoting *Knitwaves*, 71 F.3d at 1003), particularly

24

when accounting for the aforementioned thinner copyright protections for architectural drawings, *see Zalewski*, 754 F.3d at 107.

With respect to the core elements themselves, "the orientation and direction of travel of the scissor stairs differs in [Plaintiff's] Plans and the OCV Plans." (Cowley Aff. ¶ 17.) There are also differences in the stair width and the main corridor layout. (*See* Cowley Aff. App'x A § 5.6.) This undermines the heart of Plaintiff's infringement claim, the Building's core, beyond the Court's finding that these elements are unprotectable.

But the differences between the floor plans go far beyond the core elements. Plaintiff conceded, as noted above, that there are "different layout[s] of apartments." (Pilla Tr. 205:5.) This is a vast understatement. Defendants' expert "observed over 90 differences in the design and configuration of the apartments and common spaces," (Cowley Aff. ¶ 27), each of which changes the floor design's "total concept and overall feel," *Peter F. Gaito*, 602 F.3d at 66 (quotation marks omitted). A review of these differences, even at a high level, elucidates the Court's conclusion.

Beginning with the basement floor's design, the easily discernable differences between Plaintiff's and OCV's plans are as follows:

- The location and size of the exercise room;
- The location and size of general storage spaces;
- The location and size of municipal bathrooms;
- The location and size of laundry facilities;
- The location and size of gas and water meter rooms;
- The location and size of accessways to the backyard;
- The existence of a bicycle storage space;
- The existence of a boiler room; and,
- The existence of an elevator mechanical closet.

25

(*See* Cowley Aff. Ex. A, at 16.)[8]  The differences on the first floor are no less stark:

- The number and orientation of apartments, and the number of bedrooms therein;
- The location and orientation of the lobby, including the existence of a concierge desk;
- The location, orientation, and size of the garbage or trash room;
- The layouts, orientations, and sizes of kitchens, laundry rooms, living rooms, dining rooms, bedrooms, and closets in each apartment; and,
- The existence of a private terrace for an apartment.

(*See id.* at 17.)

These differences are largely replicated throughout the designs for the rest of the pre-existing floors.  Again, a review is instructive.  The differences on the second floor are:

- The location and size of the recycling or trash room;
- The number and orientation of apartments, and the number of bedrooms therein;
- The layouts, orientations, and sizes of kitchens, laundry rooms, living rooms, dining rooms, bedrooms, and closets in each apartment;
- The existence of a study in one apartment; and,
- The existence of a common room.

(*See id.* at 18.)  The differences between the third-floor plans are:

- The location and size of the recycling or trash room;
- The location of the balconies;
- The number and orientation of apartments, and the number of bedrooms therein;
- The layouts, orientations, and sizes of kitchens, laundry rooms, living rooms, dining rooms, bedrooms, and closets in each apartment; and,
- The existence of a study in one apartment.

(*See id.* at 19.)  The fourth-floor plans' differences include:

- The location and size of the recycling or trash room;
- The number and orientation of apartments, and the number of bedrooms therein;
- The layouts, orientations, and sizes of kitchens, laundry rooms, living rooms, dining rooms, bedrooms, and closets in each apartment, including the use of a master suite;
- The existence of a study; and,

---

[8] The Appendix to Cowley's Expert Report in which she lays out these differences can be found on pages 16–23 of Exhibit A.  For ease of reference, however, when citing this Appendix, the Court instead refers to ECF pages of the overall exhibit.

- The location of the balconies.

(*See id.* at 20.)  The differences on the fifth-floor plans are:

- The location, orientation, and size of the garbage or trash room;
- The number and orientation of apartments, and the number of bedrooms therein;
- The layouts, orientations, and sizes of kitchens, laundry rooms, living rooms, dining rooms, bedrooms, and closets in each apartment, including the use of a master suite;
- The existence of a study; and,
- The structure and location of the terrace.

(*See id.* at 21.)  The sixth-floor plans differ in the following ways:

- The location, orientation, and size of the garbage or trash room;
- The number of bedrooms in the proposed apartment;
- The existence of a laundry room and study-bedroom hybrid room;
- The layout, orientation, and size of the kitchen, living and dining room, bedrooms, and closets in the proposed apartment, including the access to a master suite;
- The layout of the rear terrace; and,
- The size of the front terrace.

(*See id.* at 22.)  Finally, the differences between the rooftop designs are:

- The existence of a roof garden;
- The existence of a trash room;
- The size of a mechanical area; and,
- The layout and design of the stairs.

(*See id.* at 23.)  These differences, whether considering each floor in isolation or as a whole, cannot be ignored.

In fact, Plaintiff's expert's comparison actually burnishes Defendants' argument as it pertains to the floors' designs.  Czajka opined that "OCV's plans follow [Plaintiff's] parti and express it nearly identically."  (Czajka Report § A.1.3.)  To support this contention, Czajka puts forward "[f]loor-by-floor [c]omparative [p]artis," which notably lack *any* detailed annotation of the features of an apartment, such as the kitchen, bedrooms, bathrooms, closets, laundry rooms, or measurements of any such elements.  (*Id.* App'x B.)  Czajka seemingly hopes that zooming

27

out will blur any dissimilarities.  The following are examples from the third and sixth floor comparisons, respectively, with Plaintiff's parti on the left in each and OCV's parti on the right in each:



(*Id.*)

Czajka's comparison instead lays bare just how *different* the floor layouts are.  Indeed, when comparing the drawings—which include only the basic floorplan of the apartment and the location of the core—an ordinary observer can immediately recognize that the core elements are placed in different, albeit quasi-close, locations, and that the orientations of the units are orthogonal to one another—Plaintiff's planned apartments run North-South, while OCV's planned apartments run East-West.  (*See generally id.*)  Plain and simple, the bones and fascia of each floor's respective designs comprise corpuses of entirely different species.

 "Applying [its] own 'good eyes and common sense' to each of the comparisons," *Yurman Design*, 262 F.3d at 111 (quoting *Hamil*, 193 F.3d at 102), with respect to the livable spaces' floor plans, the Court concludes that "no reasonable jury, properly instructed, could find that the two works are substantially similar," *Warner Bros.*, 720 F.2d at 240; *see Peter F. Gaito*, 602 F.3d at 69 ("[B]ecause [the] plaintiffs have failed to allege that a substantial similarity exists between [the] defendants' work and the protectible elements of [the] plaintiffs', the district court properly dismissed [the] plaintiffs' federal copyright claim." (citation and alterations omitted)); *Walker*, 784 F.2d at 49 ("[W]e conclude from a comparison of the two works that no reasonable observer could find them substantially similar beyond the level of generalized or otherwise nonprotect[a]ble ideas."); *Sari v. Am.'s Home Place, Inc.*, 129 F. Supp. 3d 317, 334 (E.D. Va. 2015) ("No reasonable jury could find that a layperson would confuse the two [architectural designs] if not looking carefully; thus, [the plaintiff] fails the second element of the substantial similarity test.").

"[A] court may determine non-infringement as a matter of law on a motion for summary judgment, either because the similarity between two works concerns only non-copyrightable elements of the plaintiff's work, or because no reasonable jury, properly instructed, could find

that the two works are substantially similar." *DeWeever v. Exec. Producer*, 178 F. Supp. 2d 417, 418–19 (S.D.N.Y. 2001) (alteration in original) (quoting *Warner Bros.*, 720 F.2d at 240).  Upon finding both that the livable spaces' designs non-copyrightable and not substantially similar, the Court grants Defendant's Motion with respect to the floors' designs, including the core elements.

<u>c.  The Front Façade</u>

Plaintiff also alleges that Defendants infringed on the front façade, both as a whole and via its individual constituent elements.  (Pl.'s Mem. 5–8.)  Defendants argue that the front façade cannot be granted copyright protections, as its features were "constrained and the design of the front façade 'was dictated by LPC's requirement to keep the design of the front façade untouched from the existing front façade of the [B]uilding.'"  (Defs.' Mem. 10 (quoting Coogan Aff. ¶ 16); *see also* Defs.' Suppl. Ltr. 2–3.)  Moreover, Defendants argue that "a side-by-side comparison of the front elevation of the two plans reveals [numerous substantive] discrepancies."  (Defs.' Mem. 7.)  Plaintiff disagrees that such elements are unprotectable and argues that "this central factual contention is sharply disputed, mandating denial of the summary judgment motion."  (Pl.'s Mem. 5.)  Further, Plaintiff avers, the unprotected portions of the front façade are substantially similar to those of OCV's designs.  (*See id.* at 5–8.)

Ultimately, Plaintiff's claim that Defendants infringed on what Plaintiff characterizes as the protected elements of its design for the front façade fails for the same reason its claim regarding the living spaces' designs does: the constituent elements of the front façade are unprotectable, but even if there were any protectable aspects or to the extent a protectable design could be made of unprotectable constituent elements, the Court finds that the front façade designs are not substantially similar.  The Court will review the individual features of the façade before reviewing its overall concept.

Before doing so, however, it is important to expound upon Plaintiff's chief argument: that LPC does not "dictate" any specific element of the façade's design and that LPC "does not impose any *specific* requirements."  (Pl.'s Mem. 19 (emphasis added).)  Plaintiff's expert similarly focuses on whether LPC imposes strict "requirement[s]" on would-be renovations to obtain approval.  (Czajka Report § C.3.)  In other words, Plaintiff argues that the designs were not "attributable" to the applicable regulatory codes—a term included in Second Circuit's opinion in *Zalewski* absent specific definition nor defined by statute—because said codes are insufficiently specific.  This argument misses the mark, as two factors lead the Court to view the term as a more generalized cause rather than a strict, narrow requirement.

First, the plain meaning of "attributable" is a causal link, though it may be one of many. *See Attributable*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/attributable (providing an example that something may be "attributable to many factors").  Non-binding precedent similarly interpreting *Zalewski* regards its decision as withholding copyright protections from architectural design choices "*influenced by* external factors," yet another generalized term.  *Lennar Homes of Tex. Sales & Mktg., Ltd. v. Perry Homes, LLC*, 117 F. Supp. 3d 913, 939–40 (S.D. Tex. 2015) (emphasis added) (relying on *Zalewski* in analyzing copyright claim for alleged infringement of home architectural design).  Indeed, in *Zalewski*, the court did not hold that such a code or regulatory requirement must be exceptionally narrow or particular to operate as a bar on copyright protections but held only that the design need only be "attributable" to said code.  754 F.3d at 105.

Second, the Second Circuit's observation that architectural designs are to be afforded "thinner" copyright protections, *see Andy Warhol*, 11 F.4th at 53, which means that "a work

31

must be virtually identical to infringe," *Mattel, Inc. v. MGA Ent., Inc.*, 616 F.3d 904, 914 (9th Cir. 2010) (quotation marks omitted), compels the Court to take a narrow approach to what elements of architectural designs are protectable.  Were the Court to adopt Plaintiff's interpretation, architectural copyrights would presumptively cover all architectural elements, except under the rare circumstances where relevant regulations mandate exceptionally specific details or features, running counter to the Second Circuit's instruction that architectural copyright protections be interpreted narrowly.  Accordingly, the Court finds that for a design feature to be "attributable to" a building code, and thus withheld from copyright law's protection, it need only have been substantially influenced by the building code, not assiduously proscribed by it.

The Court therefore asks only whether the front façade or its constituent elements were designed with regulatory compliance—as well as any other "external factors," *Lennar Homes*, 117 F. Supp. 3d at 939—in mind, which would abrogate copyright protections.[9]

Turning back to the inquiry at hand, Plaintiff contends that the similarities between its design for the front façade and that of OCV's design "include, without limitation, the arrangement and types of doors, windows, detailing, and the restoration plan."  (Pl.'s Mem. 18; *see also id.* at 5–8.)  The Court thus reviews each of these features individually, and then reviews

---

[9] The Court notes that future litigants and their experts would be well served by making particular reference to the specific regulation or rule at issue so that the Court can more easily ascertain the validity and depth of the regulation or rule's influence on the challenged design. *See Design Basics, LLC v. Forrester Wehrle Homes, Inc.*, 302 F. Supp. 3d 933, 943 (N.D. Ohio 2018) (critiquing the party's expert opinion that a design was influenced by building codes because he "did not, however, cite to any particular building code that might have affected how [party] designed its plans").  (*Cf.* Op. 17 n.7 (observing that the "code sections [to which Defendants cited at the Motion To Dismiss stage] do not clarify exactly what portions of the [d]esigns . . . were dictated by LPC's regulations").)  Indeed, the Court requested supplemental briefing for this very reason.

the front façade as a whole, to determine whether they were designed under the influence of

apposite regulations and thus unprotectable, or, if not, whether Plaintiff raises a triable issue of

fact regarding the front façade designs' substantial similarity.

### i.  Detailing

Plaintiff first argues that Defendants infringed on the front façade's "detailing."  (*Id*. at

5.)  Though Plaintiff does not define exactly what "detailing" includes, the Court believes this

term to include smaller non-structural portions of the design such as the cornices and lintels.

Two rules bear on the applicable detailing, both housed within NYC Landmarks Rules of

the NYC Landmarks Preservation Commission ("LPC Rules"), § 2-11, entitled *Repair,*

*Restoration, Replacement and Re-Creation of Building Façades and Related Exterior Elements*.

Section 2-11 introduces its approach to the review and approval of designs like those at issue

here:

> LPC Staff reviews these applications with the presumption that historic materials
> should be maintained, repaired[,] and replaced in-kind *whenever possible*.  This
> approach results in the most authentic and sympathetic interventions and preserves
> the design, materiality[,] and engineering of the historic building or improvement
> and its features.  Furthermore, the use of historic materials and methods typically
> ensures compatibility with surrounding materials in terms of expansion and
> contraction, permeability and absorption, and structural capacity, among other
> things. . . . Notwithstanding the preference for original and historic materials, LPC
> Staff *may* consider alternative repair methods and substitute materials in certain
> situations as set forth in this subdivision, while in other situations use of substitute
> materials is *prohibited*.

LPC Rule § 2-11(a) (emphases added).  At the outset, this framing evinces a strong preference

that designs hue closely to the original aesthetic and features of the landmark building lest the

proposal be rejected, thereby further delaying a project and incurring addition costs of re-

designing.  Plaintiff's expert concedes this point, too, noting that "[m]odifications to historic

façades are frequently met with opposition during the approval process."  (Czajka Report

§ C.1.1.)

Section 2-11(d), entitled *Replacement of Deteriorated Architectural Features*, defines

"architectural features" to include "individual components (e.g., cornice, lintel, band course[,] or

column)," and reads:

> (i) Replacement materials and features should match the original or historic material or feature in terms of physical and aesthetic characteristics.  For purposes of this subdivision, this means that replacement material should be "in-kind" in terms of using the actual original or historic material and installation techniques. In-kind replacement should be prioritized and fully considered prior to proposing substitute materials.
>
> (ii) Materials other than the original or historic material (hereinafter "substitute materials") may be approved in some cases where the substitute material matches or recalls the appearance of the original or historic material in terms of texture, finish, color[,] and details[.]

LPC § Rule 2-11(d)(1).

Section 2-11(f), entitled *Re-Creation and Restoration of Missing Façade Features*, reads

in relevant part:

> LPC Staff will approve the re-creation and restoration of building facade element(s) (including but not limited to roofs and cornices, stoops, storefronts, window and door openings, window and door enframements, ironwork, porches[,] and siding) to their original or historic appearance if they determine that the proposed work satisfies the following conditions:
>
> . . .
>
> (3) Materials for re-creating and restoring missing façade features must match the original or historic materials in kind or be a substitute material that meets the requirements of subdivision (d) of this section.

LPC Rule §§ 2-11(f) & (f)(3).

These rules, particularly when read in conjunction, support Defendants' contention that

the detailing at issue must match the historic design principles.  (*See* Defs.' Mem. 10–11; *see*

*also* Defs.' Suppl. Ltr. 2–3.)  More to the point, the Court is persuaded that the detailing—which

indeed appears to adhere to these standards, (*see* OCV's Plans 14–15)—was designed so as to achieve compliance with the regulatory regime, meaning the designs of the front façade's detailing are not subject to copyright protection, *see Zalewski*, 754 F.3d at 105.  Because the Court concludes that this element is beyond copyright protections, it need not undertake a substantial similarity inquiry specific to the detailing elements.  *See Savant Homes, Inc. v. Collins*, No. 13-CV-2049, 2015 WL 899302, at *5 (D. Colo. Feb. 27, 2015) (holding that because the plaintiff failed to establish copyrightable elements, "the [c]ourt could easily end its analysis here and grant summary judgment in favor of [the] [d]efendant on the copyright infringement claim"), *aff'd*, 809 F.3d 1133, 1137 (10th Cir. 2016) (affirming summary judgment where the district "court concluded [a plaintiff who had copyrighted architectural designs] had not shown that the [allegedly infringing architect's plans] included any protectable content" and "[t]he [district] court ruled this failure precluded a finding of substantial similarity—an essential element of copyright infringement"); *cf. Feist*, 499 U.S. at 361–64 (foregoing substantial similarity analysis after holding that the chief elements of a copyrighted work, namely phone records in a phone book, were not copyrightable, thereby precluding a finding of copyright infringement).

### ii.  Arrangement and Types of Doors and Windows

Plaintiff next argues that Defendants infringed on the arrangement and types of doors and windows on the front façade.  (Pl.'s Mem. 5–6.)  Specifically, Plaintiff asserts that "the elevation, dimensions and scope of work for the doors is identical between the drawings."  (*Id.* at 6.)  As Defendants' expert makes clear, the designs for the front façade both by Plaintiff and OCV were executed "to match the original doors that have been damage[d] and are in fair to poor condition."  (Cowley Report 13, § 7.1.)

Once again, there exist regulatory regimes governing the doorways at issue.  LPC Rule § 2-14, entitled *Windows and Doors*, reads: "New windows or doors may be approved if they match the original or historic windows and doors in terms of details, materials, operation, configuration[,] and finish."  LPC Rule § 2-14(f)(1).  So, too, must the "[t]he operation of a door must match the historic operation."  LPC Rule § 2-14(f)(1)(iii)(C).  The same "matching" criteria exist in rules governing existing original or historic window and door openings as well as existing non-original or non-historic window and door openings in historic districts.  *See* LPC Rule §§ 2-14(f)(1)(ii)(B), 2-14(f)(1)(ii)(C).[10]

That is not to say alterations are *never* permissible; specifically, LPC's Rules state that "[v]ariations in details will be permitted if such variations do not significantly affect the visual characteristics of the window or door."  LPC Rule § 2-14(f)(1)(i).  But approvals for non-matching designs were far from guaranteed.  Thus, while certain alternatives could have been approved does not undercut the Court's conclusion that the designs were nonetheless "attributable" to OCV's (as well as Plaintiff's) regulatory constraint in the location and type of doors and windows they could utilize, having to "match[], or otherwise harmonize[] with" the surrounding motif.  LPC Rule § 2-14(f)(1)(ii)(C).

---

[10] The Parties refer to the buildings as having been landmarked, but each Party's expert makes clear that the mechanics of this designation is the fact that the buildings are "within the West End Riverside Historic District Extension II."  (Cowley Report 2, Introduction; *see also* Cjazka Report B.)  Public records confirm this.  *See Riverside-West End Historic District Extension II*, New York City Landmarks Preservation Commission, https://www1.nyc.gov/assets/lpc/downloads/pdf/maps/HistoricDistrictMaps/Manhattan/Riverside _West_End_Extension_II.pdf.  Thus, even if the Parties fail to clarify this, the Court may take judicial notice of it in light of the available records pursuant to Fed. R. Evid. 201(b).  *See Casey v. Odwalla, Inc.*, 338 F. Supp. 3d 284, 294 (S.D.N.Y. 2018).

Given these constraints, the Court is again persuaded that the doors and windows designed were specifically influenced by, and thus the designs are "attributable to," building codes, (*see* Defs.' Mem. 10–11), which prevents the Court from considering them protected elements of Plaintiff's copyright, *see Zalewski*, 754 F.3d at 105.[11]  Again, in light of the finding that the arrangement and types of doors are not protected, the Court need not undergo a substantial similarity inquiry specifically with regard to this portion of the front façade.  *See Savant Homes*, 2015 WL 899302, at *5 (holding that summary judgment could be granted because the plaintiff failed to establish copyrightable elements); *cf. Feist*, 499 U.S. at 361–64 (foregoing substantial similarity analysis after holding that the chief elements of a copyrighted work, namely phone records in a phone book, were not copyrightable, thereby precluding a finding of copyright infringement).

### iii.  Restoration Plan

Plaintiff also argues that Defendants infringed on the front façade's "restoration plan." (Pl.'s Mem. 5.)  Plaintiff's expert report observed that the conditions statement and the cleaning restoration specifications are "identical."  (Czajka Report § C.2.)  Defendants once again reprise their arguments that "LPC Code provides strict requirements that constrain the design elements of the project, including the repair, replacement and alteration of historic building facades." (Defs.' Reply Mem. 4.)

To be sure, restoration is dictated by a complicated regime detailed in LPC Rule § 2-11(c):

---

[11]  Defendants' expert also notes that OCV's door design was "slightly modified for [Americans with Disabilities Act ('ADA')] access."  (Cowley Report 13, § 7.1.)  Both Plaintiff and Defendants fail to raise this in their briefing papers, and Plaintiff's expert report similarly fails to take note of it.  Having found the designs attributable to other building codes, however, the applicability of the ADA is moot.

(c) **Repair or Restoration of Façade Materials and Features**. Where the applicant has provided documentation, assessment, and specifications, as applicable, LPC Staff will approve repair or restoration of deteriorated façade materials and features as provided below.

. . .

    (2) **Painting and coating of facades.**

        (i) Painting facades and features that were originally or historically painted and are currently unpainted. LPC Staff will approve painting facades and building features that historically were painted in order to protect them from damage or return them more closely to their historic appearance if the proposed work meets all of the following applicable criteria:

            (A) The paint will *match original or historic paint in terms of physical and aesthetic characteristics, and the color will be in keeping with the historic color palette of the building's type, style, and age*, except that in the case of historic masonry the proposed color will match the color of the underlying masonry, unless the color is part of a significant later alteration . . . .

        (ii) Painting non-original or altered features or facades. LPC Staff will approve the painting of facades or features that are not original, or were altered or damaged prior to designation, in order to improve their appearance or conceal non-original materials, if the proposed work meets all of the following applicable criteria:

            (A) The *paint will blend with the surrounding materials, helping the feature recede from view*; or
            (B) The *paint will be harmonious with other elements on the building or adjacent buildings, thereby helping unify the appearance and relationship of the elements*[.]

           . . .

    (3) **Pointing of mortar joints.** LPC Staff will approve raking, cutting[,] and pointing mortar joints with a cementitious mortar mix, if the proposed work meets all of the following applicable criteria:

        (i) The mortar will *match original or historic mortar in terms of physical and aesthetic characteristics*[.]

        . . .

    (5) **Repair of fired clay and ceramic unit masonry (including brick and terra cotta).** LPC Staff will approve an application to repair brick, glazed terra cotta[,] or other fired unit masonry surfaces if the proposed work meets all of the following applicable criteria:

        (i) Repairs will *match the original or historic brick or terra cotta in terms of physical and aesthetic characteristics*[.]

        . . .

    (6) **Repair of stucco.** LPC Staff will approve an application to repair stucco elements and surfaces, including any underlying wood or metal lathe, if the proposed work meets all of the following applicable criteria:

(i) The stucco or cementitious patching compound *will match original or historic stucco in terms of physical and aesthetic characteristics*[.]

. . .

(8) **Repair of cast and wrought iron and other cast or extruded ornamental metals.**  LPC Staff will approve an application to repair cast, wrought[,] or extruded metal elements by removing, repairing[,] and reinstalling existing elements, if the proposed work meets all of the following applicable criteria:

(i) The cast, wrought or extruded metal repair *will match original or historic cast and wrought iron and other cast or extruded ornamental metals in terms of physical and aesthetic characteristics*[.]

. . .

(9) **Repair of wood features.**  LPC Staff will approve an application to repair wood elements by removing, repairing[,] and reinstalling existing elements, if the proposed work meets all of the following applicable criteria:

(i) The wood repair *will match original or historic wood in terms of physical and aesthetic characteristics*[.]

. . .

(10) **Repair of other materials.**  LPC Staff will approve the repair of other materials or building facades that do not fall into any of the previously described categories, including but not limited to laminates, plastic and synthetic rubbers, curtain walls, and poured concrete, if the repair *will match original or historic material in terms of physical and aesthetic characteristics*.  In connection with such repairs, LPC Staff may approve the repair of minor portions of these other materials with substitute materials that *otherwise match the physical and aesthetic characteristics, provided the use of substitute materials will not detract from the original materials*.

LPC Rule § 2-11(c) (emphases added).  As the rules—and particularly the emphasized clauses—show, LPC repeatedly makes clear that the restoration of all categories of materials on the façade is heavily regulated and scrutinized to ensure the aesthetic is unchanged.  For that reason, a restoration plan and conditions statement may be attributable to the above regulatory regime, which would vitiate copyright protection. *See Zalewski*, 754 F.3d at 105.

Plaintiff's argument suffers from a more foundational infirmity, however: the restoration plan and conditions statement, as distinct from the architectural sketches themselves, are ideas beyond the scope of copyright protections.  "[T]he most fundamental axiom of copyright law [is]

that no one may copyright facts or ideas." *Feist*, 499 U.S. at 353.  Pursuant to this proposition,

the Copyright Act expressly prohibits such protections from being "extend[ed] to any idea,

procedure, process, system, method of operation, concept, principle, or discovery, regardless of

the form in which it is described, explained, illustrated, or embodied in such work."  17 U.S.C.

§ 102(b).  And in this vein, the Copyright Office maintains that "[i]deas, plans, methods,

systems, or devices" are not copyrightable, "as distinguished from the particular manner in

which they are expressed or described in a writing."  37 C.F.R. § 202.1(b).  Thus, while "[i]t is

well-established that architectural plans are eligible for copyright protection," *Innovative*

*Networks, Inc. v. Satellite Airlines Ticketing Ctrs., Inc.*, 871 F. Supp. 709, 719 (S.D.N.Y. 1995)

(citing *Demetriades v. Kaufmann*, 680 F. Supp. 658, 663 (S.D.N.Y. 1988)), elements of

architectural designs such as "individual standard features and architectural elements classifiable

as ideas or concepts are not themselves copyrightable," *Thomson*, 2015 WL 11256775, at *10

(quoting *Intervest Constr., Inc. v. Canterbury Estate Homes, Inc.*, 554 F.3d 914, 919 (11th Cir.

2008)); *see also Savant Homes*, 809 F.3d 1133, 1139–40 (10th Cir. 2016) (same).  Indeed,

> [A] leading treatise explains that the Copyright Act 'accords protection' to
> architectural elements 'only when the design elements are not functionally
> required,' with the consequence that 'purely functional elements of an architectural
> work, such as innovations in architectural engineering or construction techniques'
> will not receive copyright protection standing alone.

*Patel Burica & Assocs., Inc. v. Jason Lin*, No. 19-CV-1833, 2020 WL 491467, at *4 (C.D. Cal.

Jan. 30, 2020) (citations omitted) (quoting 1 Nimmer on Copyright § 2A.09 & 923 (2019)).

The conditions statement and restoration plan "plainly serve patently functional

purposes. . . .  They are not design elements that are protectable under the copyright laws, even if

they are components of a larger design that has received copyright protection in the aggregate."

*Id.*; *see also id.* at *5 (rejecting copyright protections to portions of an architectural design that

"merely displays a preferred method" of engineering required to achieve the purportedly copyrighted design).  Accordingly, the Court finds that the restoration plan and conditions statement, which serve only to inform a developer as to the status of a building prior to renovation and the effective to-do list, may not be protected by copyright.  Therefore, any similarities between the two—and the Court concedes that the two sets are nearly identical[12]— "proves at most copying, not wrongful copying," *Zalewski*, 754 F.3d at 106, and "no amount of access or copying will suffice to show infringement if there is no *wrongful* copying," *Nw. Home Designing, Inc. v. Benjamin Ryan Communities, LLC*, No. 14-CV-5808, 2016 WL 5373144, at *8 (W.D. Wash. Sept. 26, 2016).  Because these portions of the design cannot be protected by copyright, Plaintiff cannot plausibly allege a claim of infringement, and Defendants' Motion in this regard must be granted.  *See Savant Homes*, 2015 WL 899302, at *5 (granting summary judgment because the plaintiff failed to establish copyrightable elements); *cf. Feist*, 499 U.S. at 361–64 (foregoing substantial similarity analysis after holding that the chief elements of a copyrighted work, namely phone records in a phone book, were not copyrightable, thereby precluding a finding of copyright infringement).[13]

---

[12] Czajka is correct that, save for one additional paragraph OCV added regarding the conditions of the windows, the conditions statements and the restoration plans are identical, even down to their staccato syntax (i.e., missing verbs and articles, such as bullet points in paragraph form).  (*See* Czajka Report § C.2.1; *compare* Rowland Decl. Ex. H (Dkt. No. 66-11), at 8 (Plaintiff's architectural drawings at A903.00, including both the Conditions Statement and the Restoration Plan) *with* Rowland Decl. Ex. K (Dkt. No. 66-25), at 1 (OCV's architectural drawings at 212.00, including the conditions statement) *and id*. (Dkt. No. 66-24), at 6 (OCV's architectural drawings at 210.01, including the restoration plan, titled "Façade Cleaning").)

[13] For this reason, the Court also finds that Plaintiff's claim of infringement vis-à-vis its planned manufacturer of the door, (Pl.'s Mem. 6), is beyond the scope of copyright and therefore cannot give rise to a copyright infringement claim.

#### iv.  Sixth Floor Addition's Façade

The last constituent element Plaintiff cites on the front façade is that of the sixth-floor addition.  (Pl.'s Mem. 21.)  Plaintiff takes issue with Defendants' statement that "the 6th floor front façade windows and doors were designed to be consistent with the pattern and layout of the windows on the lower floors," (Defs.' Mem. 11), claiming that no such rule required this and that this is tantamount to an admission that OCV copied Plaintiff's design, (Pl.'s Mem. 21).  Once again, the Court disagrees.

As Defendants note, LPC Rule § 2-14(f)(1) states that new windows or doors placed on primary or front-facing façades "may be approved if they match the original or historic windows and doors in terms of details, materials, operation, configuration[,] and finish."  LPC Rule § 2-14(f)(1).  The same is true for new windows and doors "installed in existing original or historic openings" in small or large residential and commercial buildings in historic districts.  LPC Rule §§ 2-14(f)(2)(ii)(B), 2-14(f)(2)(iii)(B).  Importantly, the term "configuration" in this rule is defined as "the number, shape, organization[,] and relationship of panes (lights) of glass, sash, frame, muntins, or tracery."  LPC Rule § 2-14(b).  Accordingly, the Court agrees with Defendants that the sixth floor addition's façade design—both from Plaintiff and OCV—was undertaken to achieve compliance with the regulatory regime.  Thus, once more, the sixth floor's front façade is entitled to no copyright protections.  *See Zalewski*, 754 F.3d at 105.

#### v.  Overall Concept

Despite having concluded that each of the elements Plaintiff cited in the front façade designs are unprotectable—either given the element's attribution to regulatory rules or its accurate classification as an idea—the Court must nonetheless review the entirety of the design, as a work may be copyrightable notwithstanding that the work is comprised solely of

unprotectable elements.  *See Feist*, 499 U.S. at 350–51 (holding that a work may be copyrightable—and therefore infringed upon—notwithstanding that said work is only a compilation of unprotectable elements).  That is not the case here, however.  In such an instance, copyright is limited to "an original selection or arrangement."  *Id.* at 350.  However, no such original selection can be said to exist here.  The placement of doors and windows is far more the result of "generalized notions of where to place functional elements," which are unprotectable, *Attia*, 201 F.3d at 55, than the unique, creative combination of otherwise unprotectable elements, which constitutes artistic expression to which copyright protections are afforded, *see Feist*, 499 U.S. at 350–51.  Indeed, the Court agrees with Defendants' apt summary:

> All new and restored building materials (including brick and iron work), windows, doors, balconies, and openings had to exactly match the building's pre-existing aesthetics and configuration dictating the appearance and location of every design element of the exterior facades of the building.  Therefore, no element of the design of the front . . . façade was unique.

(Defs.' Suppl. Ltr. 3.)  Accordingly, neither the individualized aspects or features nor the overall concept for the front façade is protected.  Therefore, Defendants did not infringe on Plaintiff's designs, and Defendants' Motion is granted with regard to the front façade.  *See Patel Burica*, 2020 WL 491467, at *5 (granting defendants' motion to dismiss after finding that all elements of architectural design cannot be protected by copyright because the elements are functional elements).

Again, even assuming arguendo that these elements were not *entirely* dictated by the vast regulatory regime and were sufficiently unique to merit protection via copyright—meaning that there was *some* degree of room for a finding of substantial similarity—the Court is persuaded that a number of marked differences in designs render the designs sufficiently dissimilar. Defendants correctly list these distinctions: the bulkheads, the doors, the ladders, the masonry

work, the railing, and the design of the ground floor all distinguish Plaintiff's plans from OCV's

plans.  (*See* Defs.' Mem. 7–8.)  These differences preclude a finding of substantial similarity,

particularly amid the aforementioned lesser protections afforded in the architectural sphere, *see*

*Andy Warhol*, 11 F.4th at 53; *Zalewski*, 754 F.3d at 106–07 (rejecting a finding of substantial

similarities amidst thinner copyright protections because "there are *subtle* differences in the

paneling, size, and framing of [the designs'] doors," and explaining that although "these

differences are not great, . . . given the constraints . . . they are significant" (emphasis added)).

### d.  The Rear Façade

Finally, Plaintiff asserts that Defendants also wrongfully copied the design for the rear

façade, (*see* Pl.'s Mem. 21–22), and in its opposition to the Motion, Plaintiff identifies the

following similarities: "add[ing] balconies to floors where balconies did not exist previously,

hav[ing] similar masonry openings, plac[ing] the door to the balconies on the 3-bay portion of

the window openings, plac[ing] brick cornices above the fourth and fifth floor window openings,

and omit[ting] a parapet at the rooftop level," (*id.* at 21).  Indeed, Plaintiff's arguments rely

chiefly on the "numerous similarities" of its designs as compared to those of OCV, essentially

sidestepping the question of regulatory attribution.  (*See id.* at 10–11.)

In both their memoranda in support of their Motion and in their Supplemental Letter

briefing, Defendants tie the rear façade to relevant regulatory rules and consumer demands, (*see*

Defs.' Reply Mem. 2–3; Defs.' Suppl. Ltr. 2–3).  And in the alternative, Defendants contend that

the differences in the rear façade foreclose a finding a substantial similarity.  (*See* Defs.' Mem.

8–9; Defs.' Reply Mem. 6).

Once again, the Court finds that these elements are not subject to copyright protections

and that there is no genuine issue of material fact that the designs are not sufficiently

substantially similar, in light of copyright's "thinner" protections afforded to architectural

designs.  *See Zalewski*, 754 F.3d at 107 (describing the protections afforded to architectural

drawings by copyright as "very thin," and explaining that "[o]nly very close copying" would rise

to the level of infringement).  The Court reviews the constituent features before turning to the

overall design to articulate its reasoning.

i.  Balconies

With respect to the rear façade balconies, Plaintiff asserts that OCV infringed upon its

copyright insofar as Plaintiff's designs added rear balconies.  But as Defendants' expert Coogan

makes clear, the addition of balconies as a general concept is the result of Gilat's expressed

desire to maximize space, (Gilat Tr. 18:10), and "benefit from a maximum of natural light and

exposure to the outdoors *through balconies* and terraces," (Coogan Aff. ¶ 12 (emphasis added)).

As stated previously, Pilla conceded this in his deposition, admitting Gilat specifically requested

"balconies in the back."  (Pilla Tr. 207:13–15.)  Moreover, Plaintiff implies that wrongful

copying is evidenced by the fact that only wrongful copying could explain why "[b]oth sets of

designs contain balconies beginning on the third floor."  (Pl.'s Mem. 10.)  However, zoning

regulations maintain that balconies in that zoning district were not permitted lower than the third

story of a building or at least twenty feet above the ground.  (*See* Defs.' Suppl. Ltr. 3 (citing

NYC ZR § 12-132(e)).)  Therefore, the Court finds that the addition of balconies was the result

of client demands as constrained by regulatory restrictions, thereby obviating Plaintiff's

copyright with respect to the design choice to add balconies.  *See Zalewski*, 754 F.3d at 105.

The same is true with regard to placing the door to the balconies on the 3-bay portion of

the window openings.  The Court agrees with Defendants' argument: this is attributable to

Defendants' design parameters to maximize living space, as alternative designs would likely

45

have cut away at some of the living space.  (*See* Defs.' Reply Mem. 6.)  Moreover, this idea

speaks to one of a standard flow of design, namely that it would be nonsensical to design a

balcony in order to maximize space without having an access door that similarly maximizes

space.  *Cf. Zalewski*, 754 F.3d at 106 ("[The] [p]laintiff can get no credit for putting a closet in

every bedroom, a fireplace in the middle of an exterior wall, and kitchen counters against the

kitchen walls.").  In other words, this arrangement "serve[s] to make the space more livable, not

to make a design statement."  *Sari*, 129 F. Supp. 3d at 327.

   Even if the balconies were deemed protectable, they are not substantially similar.

Plaintiffs' sole argument with respect to the similarities of the balconies themselves is their

existence and the doors leading out to the balconies.  (*See* Pl.'s Mem. 21 ("Both sets of drawings

add balconies to floors where balconies did not exist previously [and] place the door to the

balconies on the 3-bay portion of the window openings.").)  But as Defendants make clear, the

designs of the balconies are not substantially similar because they are located in different spots

along the [B]uilding's wall, as are the doors leading out to them.  (*Compare* OCV's Plans 9–11

(showing balconies on the third and fourth floors on the outer-most portions of the [B]uilding),

*with* Plaintiff's Interior Plans 4–5 (showing balconies on the third and fourth floors on the inner-

most portions of the [B]uilding).)  And because OCV also rearranged the orientation of the

designed apartments, balconies in OCV's designs are only available for one unit, with one

balcony in the living or dining room, and one in the master bedroom, whereas in Plaintiff's

designs, each apartment gets one balcony.  (*See id.*)  Therefore, Defendants did not infringe upon

Plaintiff's copyright with respect to the balconies, as they are neither protected elements nor

substantially similar.  *See Warner Bros.*, 720 F.2d at 240 ("[A] [district] court may determine

non-infringement as a matter of law on a motion for summary judgment, either because the

similarity between two works concerns only *non*-copyrightable elements of the plaintiff's work, or when no reasonable jury, properly instructed, could find that the two works are substantially similar." (quotation marks and citation omitted)).

### ii.  Remaining Visual Elements, and the Overall Design

The remaining visual elements, including the masonry openings, brick cornices, and the removal of a parapet, speak to the overall design of the rear façade.  This original or historic motif is itself a "recognized style[] from which architects draw."  *Zalewski*, 754 F.3d at 105.  For that reason alone, the elements to which Plaintiff points would likely be protected under the scènes-à-faire doctrine.  *See id.* ("There are scènes-à-faire in architecture.  Neoclassical government buildings, colonial houses, and modern high-rise office buildings are all recognized styles from which architects draw.  Elements taken from these styles should get no protection.").  To that end, both Plaintiff's and OCV's designs include a rendering of the neighboring building's façade; a side-by-side comparison of each design against that eastward neighboring façade demonstrates that the design choices were undertaken to promote uniformity in style.  (*See* Rowland Decl. Ex. G, at 17, 19 (Dkt. No. 66-8) (Plaintiff's initial drawings showing existing and proposed front elevations against east front elevations); Rattner Decl. Ex. 9, at 2 (Dkt. No. 77-9) (OCV's initial drawings showing proposed front elevations against east front elevations).)

The rules promulgated by LPC specifically to maintain this motif in the historic district in which the [B]uilding is located crystallizes the Court's conclusion.  As noted previously, LPC rules specifically dictate that "the repair, restoration, replacement[,] or re-creation must match the original or historic materials and features in terms of its physical and aesthetic

characteristics." (Defs.' Suppl. Ltr. 2 (quoting LPC Rule § 2-11(b)(3))).[14]  Because the rear

façade's overall design was undertaken to comply with this regulation, (*see id*.), the Court once

again agrees with Defendants' apt summary:

> All new and restored building materials (including brick and iron work), windows, doors, balconies, and openings had to exactly match the [B]uilding's pre-existing aesthetics and configuration dictating the appearance and location of every design element of the exterior facades of the [B]uilding.  Therefore, no element of the design of the . . . rear façade was unique.

(*Id.* at 3.)

In fact, this point is made even more vividly when considering the rear façade of the

sixth-floor addition.  Defendants correctly cite to six (of approximately nine) rules regarding rear

additions on buildings in historic districts that constrain the architectural design of the rear

façade for a new addition even beyond the aforementioned general restrictions:

> (a) "The addition is not visible from a public thoroughfare"; (b) "The addition is as-of-right for bulk, massing and height under the Building Code and Zoning Resolution"; (c) "the depth and height of the proposed addition is not deeper than the predominant depth or taller than the predominant height of additions or else on buildings of a similar type"; (d) "the façade(s) of the addition recall(s) the character of rear façades and additions of buildings of its type"; (e) window and door openings and configurations "match original historic elements and configurations"; and (f) if the work involves combining adjacent buildings (which the Project did) "the addition must expresses the original width of each of the historic buildings."

(*Id.* (quoting LPC Rule § 2-15(f)).)[15]

---

[14] Notably, one of Defendants' experts, Cowley, cites to a different rule, LPC Rule § 6-4. (*See* Cowley Aff. ¶ 11 & n.5.)  However, from the Court's review, it appears as if this rule is in fact inapposite.  That rule, titled *Modifications of and Additions to Existing Buildings*, appears to speak to the conditions under which proposed modifications or alterations receive Certificates of No Effect, Permits for Minor Work, or Certificates of Appropriateness, the latter of which requires a public hearing on the application.  *See* LPC Rule § 6-04.  Nonetheless, in light of Defendants' Supplemental Letter on the appropriate rules to which the Court cites, the Court does not discount the validity of Defendants' arguments overall.

[15] Defendants inadvertently failed to attribute their quoted language (or clean up small errors in the LPC Rule itself), but a simple review of the regulatory regime proves Defendants' Letter to be accurate.

48

Having reviewed the architectural drawings, (*see* OCV's Plans 15), and the regulatory regime, the Court concludes that the rear façade design, including both the individual visual elements Plaintiff identified as well as its entire concept, is "attributable to building codes" and thus afforded "no protection." *Zalewski*, 754 F.3d at 105.[16]

Even if the Court had determined that either the constituent elements of the rear façade or the rear façade in its entirety were entitled to any measure of protection, the Court would still conclude that the two designs are not substantially similar. The Court agrees with Defendants that "the window arrangement, balcony locations and shape of the roof bulkhead of the rear façade are different in both drawings." (Defs.' Reply Mem. 6.)[17] It is also the case that there exist distinctions with respect to the cellar, the doors and windows on the ground floor, and the masonry. (Defs.' Mem. 8–9.) While these distinctions may be more subtle or fewer than the number and degree of distinctions between the designs of the living spaces, the rear façade designs are sufficiently different to warrant a finding that they are not substantially similar. *See*

---

[16] Defendants also imply that the façade's design is unprotectable because it is the result of "engineering necessity." *Zalewski*, 754 F.3d at 105. (*See* Defs.' Mem. 11 (citing Coogan Aff. ¶ 16 to claim that the façade's design was "determined utilizing the practical construction design decision to use standard sized bricks."); Defs.' Reply Mem. 6 (same).) Coogan's affirmation—on which Defendants rely for this point—does not, however, state this, instead explaining that the brick choice was a result of LPC regulations. (*See* Coogan Aff. ¶ 16.) To that end, Defendants fail to articulate the practical engineering advantages regarding these standard-sized bricks necessary to substantiate their claim. Accordingly, the Court cannot alone find that the rear façade's design is unprotectable due to its relation to relevant principles of engineering. Ultimately, this matters not, as the Court comes to the same conclusion regarding copyright's protection in reliance on the regulatory regime's influence over the design.

[17] The Court also agrees with Defendants that Plaintiff essentially "concedes" this point, having failed to substantially answer it, *see Rosenblatt v. City of New York*, No. 05-CV-5521, 2007 WL 2197835, at *7 (S.D.N.Y. July 31, 2007) ("[The] [p]laintiff effectively concedes [the] defendants' other arguments . . . by her failure to respond to them[.]"), further buttressing this point.

*Zalewski*, 754 F.3d at 106–07 (rejecting a finding of substantial similarity where "there are *subtle* differences in the paneling, size, and framing of [the designs'] doors" because "[t]hese differences," while "not great . . . are significant" enough amidst thinner copyright protections for architectural designs to merit such a finding (emphasis added)).  Accordingly, Defendants' Motion is granted with regard to the rear façade.  *See id.* at 107 (dismissing copyright infringement claim with regard to architectural copyrights because "[c]opying that is not so close would—and in this case did—only capture the generalities of the style in which [the] [p]laintiff worked and elements common to all homes," concluding that "[the] [d]efendants' houses shared [the] [p]laintiff's general style, but took nothing from his original expression").

### 2.  DMCA Claim

Under the DMCA, it is unlawful to knowingly, and with the intent to "induce, enable, facilitate, or conceal infringement," either "provide" or "distribute" (or "import for distribution") false Copyright Management Information ("CMI").  17 U.S.C. § 1202(a).  CMI includes, inter alia, "the title or identifying information of the work, author or copyright owner, the terms and conditions of use of the work, and identifying numbers or symbols referring to such information."  *BanxCorp v. Costco Wholesale Corp.*, 723 F. Supp. 2d 596, 609 (S.D.N.Y. 2010) (citing 17 U.S.C. § 1202(c)(1)–(3), (6)–(7)).

Additionally, "[t]he DMCA prohibits . . . 'intentionally removing or altering any [CMI].'"  *Zalewski*, 754 F.3d at 107 (alterations omitted) (quoting 17 U.S.C. § 1202(b)).  To succeed on a claim for removal of CMI, Plaintiff must allege "(1) the existence of CMI on the [work at issue]; (2) removal and/or alteration of that information; and (3) that the removal and/or alteration was done intentionally."  *Fischer v. Forrest*, 286 F. Supp. 3d 590, 608 (S.D.N.Y. 2018) (alteration in original) (quoting *BanxCorp*, 723 F. Supp. 2d at 609), *aff'd,* 968 F.3d 216

(2d Cir. 2020); *cf. Associated Press v. All Headline News Corp.*, 608 F. Supp. 2d 454, 461
(S.D.N.Y. 2009) (noting that the DMCA is violated by "removing and/or altering copyright-
management information," and denying a motion to dismiss when the plaintiff alleged that its
articles identified it as the owner and author and that the defendants intentionally altered or
removed that information).  This final prong "contains a so-called 'double-scienter' requirement:
the defendant who distributed improperly attributed copyrighted material must have actual
knowledge that CMI 'has been removed or altered without authority of the copyright owner or
the law,' as well as actual or constructive knowledge that such distribution 'will induce, enable,
facilitate, or conceal an infringement.'"  *Mango v. BuzzFeed, Inc.*, 970 F.3d 167, 171 (2d Cir.
2020) (quoting 17 U.S.C. § 1202(b)); *see also Krechmer v. Tantaros*, 747 F. App'x 6, 9 (2d Cir.
2018) (summary order) (referring to the "double scienter requirement").

      This claim relies entirely on Plaintiff's copyright infringement claim.  Indeed, Defendants
are correct that "there is no dispute with respect to the fact that the drawings submitted to DOB
on behalf of W 108 were not identical copies of the [Plaintiff's] Drawings with [Plaintiff]'s CMI
removed and replaced with OCV's CMI."  (Defs.' Mem. 12.)  "It is also undisputed that the
[OCV] Drawings do not contain [Plaintiff's] CMI."  (Pl.'s Mem. 23.)  Rather, Plaintiff asserts,
"if the drawings are found to be substantially similar, a reasonable juror could conclude that
[Plaintiff's] CMI was removed notwithstanding Gilat's self-serving testimony to the contrary."
(*Id.* at 23–24.)  Plaintiff argues that between Gilat's testimony, Gilat's provision of Plaintiff's
drawings to OCV, (Gilat Tr. 106:10-17; *see also* Rattner Decl. Ex. 7, at 2 (Dkt. No. 77-7)), and
Gilat's inquiry to OCV as to whether anything was "salvageable" from Plaintiff's drawings,
(Rattner Decl. Ex. 7, at 2), "a reasonable juror could conclude that Defendants directed the
removal of CMI intentionally," (Pl.'s Mem. 24 (citations omitted)).

Some courts have held that the "scienter required for a DMCA violation can be proven through circumstantial evidence." *Huffman v. Activision Publ'g, Inc.*, No. 19-CV-50, 2020 WL 8678493, at *14 (E.D. Tex. Dec. 14, 2020) (citing *GC2 Inc. v. Int'l Game Tech.*, 391 F. Supp. 3d 828, 841–42 (N.D. Ill. 2019)), *report and recommendation adopted*, 2021 WL 2141352 (E.D. Tex. May 26, 2021).[18]  But, once more, Plaintiff's argument to this effect ultimately misses the mark.

Defendants have not inappropriately claimed authorship over any of Plaintiff's copyrighted materials.  Even if Defendants had improperly infringed upon Plaintiff's copyright by incorporating protected features into their redesign, Defendants "did not violate the DMCA by printing [OCV's] name on the distinct products [Plaintiff] had generated." *Park v. Skidmore, Owings & Merrill LLP*, No. 17-CV-4473, 2019 WL 9228987, at *11 (S.D.N.Y. Sept. 30, 2019).

*Park* is particularly instructive.  In that case, the plaintiff, an individual architect who had published a student thesis in which he designed a skyscraper, alleged that the defendants, a preeminent architectural firm, used the published and copyrighted design in its design of One World Trade Center.  *See generally id.* at *1–2.  The court compared two cases:  *Faulkner Press, L.L.C. v. Class Notes, L.L.C.*, 756 F. Supp. 2d 1352 (N.D. Fla. 2010), and *Fischer*, 2015 WL 195822.  In the former,

---

[18] In its earlier opinion, the Court observed: "Plaintiff also appears to state a claim for provision of false CMI under 17 U.S.C. § 1202(a)," but determined that, "[b]ecause the Parties have not briefed whether Plaintiff states a claim for provision or distribution of false CMI, the Court will not address it here."  (Op. 30–31.)  Once again, notwithstanding Plaintiff's rhetoric in its Complaint with respect to distribution of false information, which sounds in a violation of § 1202(b), because Plaintiff's did not argue such a point in their briefing—even after it was addressed in the Court's 2019 opinion—the Court deems Plaintiff's claim abandoned allegation. *See Bank v. Hydra Grp., LLC*, No. 10-CV-1770, 2017 WL 9938286, at *4 (E.D.N.Y. Dec. 20, 2017) ("At this point, [the] [p]laintiff has waived any argument . . . as he did not raise it in his moving papers.") (collecting cases).

the defendant did not remove any copyright information from the plaintiff's original work.  [*Faulkner*, 756 F. Supp. 2d] at 1359.  Rather, the defendant incorporated the plaintiff's copyrighted materials into its own work and then applied its name as the author of the work.  *Id.*  Although incorporating the plaintiff's materials might have constituted copyright infringement, the court concluded that the defendant did not violate the DMCA by printing its name on the distinct products it had generated.  *Id.* at 1359–60.  Conversely, in *Fischer* . . . , on which [the] [p]laintiff relies, the plaintiff *did* remove copyright information from the original work.

*Park*, 2019 WL 9228987, at *11 (citation omitted).  Therefore, in *Park*, because the architectural firm did not remove any CMI, notwithstanding the potential infringement, the court dismissed the DMCA claim.  *See id*.

The *Faulkner-Fisher* dichotomy is similarly appropriate here, and both *Faulkner* and *Park* are analogous to Plaintiff's claims in this action.  "[A] party that puts its own CMI on work distinct from work owned by a copyright holder is not liable under [§] 1202(a), even if the party's work incorporates the copyright holder's work," *Michael Grecco Prods., Inc. v. Time USA, LLC*, No. 20-CV-4875, 2021 WL 3192543, at *5 (S.D.N.Y. July 27, 2021), and even if the incorporation "constituted copyright infringement," *Park*, 2019 WL 9228987, at *11 (citing *Faulkner*, 756 F. Supp. 2d at 1359–60).  As was the case in *Faulkner* and *Park*, Plaintiff cannot point to any evidence that Defendants circulated Plaintiff's original work with OCV's (or its agents') CMI.  (*See* Defs.' Mem. 12; Defs.' Reply Mem. 8.)  Moreover, the Court is aware of no evidence that Plaintiff's plans were cropped or edited in any way when they were circulated to OCV, (*see* Gilat Tr. 107:19–25 (Gilat conceding that she circulated a PDF of Plaintiff's original designs but stating affirmatively that she did not crop it); *see also* Gilat Aff. ¶ 18), which—had it occurred—would speak to the intentional removal or alteration barred by the DMCA, *see* 17 U.S.C. § 1202(b).  Therefore, there exists no triable issue of fact on this issue.  The Court accordingly grants Defendants' Motion with respect to Plaintiff's DMCA claim.  *Cf. Park*, 2019 WL 9228987, at *11 (dismissing DMCA claim for the submission of work potentially

incorporating copyrighted materials where alleged infringer did not submit materials that straightforwardly placed its own CMI on duplicate work).

### 3.  Costs and Attorney's Fees

Congress provided for a particular remedy for copyright infringement actions in the form of costs or attorney's fees:

> In any civil action under this title, the court in its discretion *may* allow the recovery of full costs by or against any party other than the United States or an officer thereof.  Except as otherwise provided by this title, the court *may also* award a reasonable attorney's fee to the prevailing party as part of the costs.

17 U.S.C. § 505 (emphases added).

"The two key aspects of this grant of authority are as follows: (1) a fee award is limited to a prevailing party; and (2) a fee award is not mandatory, so whether to make such an award lies within the sound discretion of the court."  *Shaw Fam. Archives, Ltd. v. CMG Worldwide, Inc.*, 589 F. Supp. 2d 331, 349 (S.D.N.Y. 2008).  Thus, the Court must first determine whether Defendants constitute the "prevailing party," or additional inquiry is unnecessary.

"Logic and the parity of treatment between prevailing plaintiffs and defendants mandated by the Supreme Court . . . dictates that [D]efendants should be considered prevailing parties . . . when they successfully defend against the significant claims actually litigated in the action.  Under this standard, . . . [D]efendants here are a 'prevailing party' for purposes of [§] 505."  *Screenlife Establishment v. Tower Video, Inc.*, 868 F. Supp. 47, 50 (S.D.N.Y. 1994) (citation omitted).  Therefore, the Court asks whether, as prevailing parties, Defendants ought to be awarded attorney's fees and/or costs within the Court's discretion.

The Supreme Court has made clear that "attorney's fees are to be awarded to prevailing parties *only* as a matter of the court's discretion."  *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 (1994) (emphasis added).  Thus, post-*Fogerty*, it is no longer the case that "fees are generally

awarded to a prevailing plaintiff." *Twin Peaks Prods., Inc. v. Publ'ns Int'l, Ltd.*, 996 F.2d 1366, 1383 (2d Cir. 1993) (quoting *N.A.S. Import, Corp. v. Chenson Enters., Inc.*, 968 F.2d 250, 254 (2d Cir. 1992)); *see also Barcroft Media, Ltd. v. Coed Media Grp., LLC*, No. 16-CV-7634, 2018 WL 357298, at *1 (S.D.N.Y. Jan. 10, 2018) (explaining that *Fogerty* abrogated the idea that attorney's fees and costs were typically awarded).

In a copyright action, "[w]hen determining whether to award attorney[']s fees, district courts may consider such factors as (1) the frivolousness of the non-prevailing party's claims or defenses; (2) the party's motivation; (3) whether the claims or defenses were objectively unreasonable; and (4) compensation and deterrence." *Bryant v. Media Right Prods., Inc.*, 603 F.3d 135, 144 (2d Cir. 2010) (citing *Fogerty*, 510 U.S. at 534 n.19). "The third factor—objective unreasonableness—should be given substantial weight." *Id.* (citing *Matthew Bender & Co. v. W. Publ'g Co.*, 240 F.3d 116, 122 (2d Cir. 2001)).

### a.  Frivolousness and Objective Reasonableness

Though "[o]bjective unreasonableness is not the same as frivolousness," *TCA Television Corp. v. McCollum*, No. 15-CV-4325, 2017 WL 2418751, at *14 (S.D.N.Y. June 5, 2017) (citing *Kirtsaeng v. John Wiley & Sons, Inc.*, 579 U.S. 197, 202 (2016)), *report and recommendation adopted*, 2018 WL 2932724 (S.D.N.Y. June 12, 2018), "[t]he line separating them is not . . . well-defined," *id.; see also Agence France Presse v. Morel*, No. 10-CV-2730, 2015 WL 13021413, at *5 (S.D.N.Y. Mar. 23, 2015) (noting that objective unreasonableness and frivolousness are not necessarily "coextensive" (quoting *Gordon v. McGinley*, No. 11-CV-1001, 2013 WL 1455122, at *2 (S.D.N.Y. Mar. 28, 2013))), *aff'd sub nom. Presse v. Morel*, 645 F. App'x 86 (2d Cir. 2016). For that reason, the first and third factors are often evaluated together. *See, e.g.*, *Boesen v. United Sports Publ'ns, Ltd.*, No. 20-CV-1552, 2021 WL 1145730,

at \*3 (E.D.N.Y. Mar. 25, 2021) ("The test for frivolousness largely duplicates that of objective

unreasonableness."), *aff'd*, 2022 WL 457281 (2d Cir. Feb. 15, 2022); *TCA Television*, 2017 WL

2418751, at \*14 (evaluating the first and third factors simultaneously).  If a principled distinction

between the two were to be made, it is that "frivolousness is a particularly intense form of

objective unreasonableness."  *TCA Television*, 2017 WL 2418751, at \*14 (citing *CK Co. v.

Burger King Corp.*, No. 92-CV-1488, 1995 WL 29488, at \*1 (S.D.N.Y. Jan. 26, 1995)).  Under

this interpretation, if an argument is not objectively unreasonably, it cannot be frivolous.  Thus,

the Court first asks whether Plaintiff's arguments were objectively unreasonable.

"That a defendant prevailed in the litigation . . . 'does not necessarily mean that the

plaintiff's position was frivolous or objectively unreasonable.'"  *TVT Recs., Inc. v. Island Def

Jam Music Grp.*, 446 F. Supp. 2d 235, 238 (S.D.N.Y. 2006) (quoting *Penguin Books U.S.A., Inc.

v. New Christian Church of Full Endeavor, Ltd.,* No. 96-CV-4126, 2004 WL 728878, at \*2

(S.D.N.Y. Apr. 6, 2004)); *see also Overseas Direct Imp. Co. v. Family Dollar Stores Inc.*,

No. 10-CV-4919, 2013 WL 5988937, at \*2 (S.D.N.Y. Nov. 12, 2013) ("[L]ack of success on the

merits, without more, does not establish that the non-prevailing party's position was objectively

unreasonable."); *CK Co.*, 1995 WL 29488, at \*1 ("While [the] plaintiff failed to sustain its

position, not all unsuccessful litigated claims are objectively unreasonable.").  "To hold

otherwise would establish a per se entitlement to attorney's fees whenever [issues pertaining to

judgment] are resolved against a copyright plaintiff."  *CK Co.*, 1995 WL 29488, at \*1 (italics

omitted).

Here, the Court finds that Plaintiff's arguments were neither "entirely frivolous" nor

"severely defective."  *Mango v. BuzzFeed, Inc.*, 356 F. Supp. 3d 368, 379 (S.D.N.Y.

2019), *aff'd*, 970 F.3d 167 (2d Cir. 2020).  In other words, "although this case was not ultimately

a close one, [Plaintiff's arguments and claims] were not so frivolous or objectively unreasonable

that no party 'could see an opening . . . through which the arguments could be squeezed.'" *Otto*

*v. Hearst Commc'ns, Inc.*, No. 17-CV-4712, 2020 WL 377479, at *3 (S.D.N.Y. Jan. 23, 2020)

(second alteration in original) (quoting *Barcroft*, 2018 WL 357298, at *1), *reconsideration*

*denied*, 2020 WL 1033355 (S.D.N.Y. Mar. 3, 2020).  This is evidenced by the fact that the Court

denied Defendants' Motion to Dismiss with respect to the majority of Plaintiff's claims, citing

Defendants' need "to develop a factual record on what constraints existed because of [regulatory

regimes] and what features of the expansion plans those codes dictated," (Op. 17), as well as

develop "a factual record demonstrating what . . . market expectations, design parameters, and

functional considerations" would support Defendants' arguments, (*id.* at 20).  In other words,

this case was "a complex, fact-driven inquiry, and the factual context of this case was relatively

novel," suggesting that litigation was not objectively unreasonable.  *Otto*, 2020 WL 377479, at

*3 (citation omitted).  In sum, "[t]hough Plaintiff was unsuccessful in this litigation, [his] filing

of the case and subsequent arguments were not objectively unreasonable."  *Yang v. Mic Network,*

*Inc.*, No. 18-CV-7628, 2020 WL 6562403, at *3 (S.D.N.Y. Nov. 9, 2020), *reconsideration*

*denied*, 2020 WL 6562403 (S.D.N.Y. Nov. 9, 2020).  This militates strongly against awarding

fees and costs to Defendants.

### b.  Party's Motivation

"The presence of improper motivation in bringing a lawsuit or other bad faith conduct

weighs heavily in favor of an award of costs and fees."  *Ariel (UK) Ltd. v. Reuters Grp. PLC*,

No. 05-CV-9646, 2007 WL 194683, at *4 (S.D.N.Y. Jan. 24, 2007) (citing *Matthew Bender*, 240

F.3d at 125–27).

Defendants assert that Plaintiff commenced this suit in bad faith.  Specifically, Defendants write, Plaintiff "commenced this action nearly three years after [Defendants] commenced an [action] against it in New York State Court . . . to exert litigation leverage and pressure over [Defendants]."  (Defs.' Mem. 13.)  Plaintiff asserts in response that it "applied for copyright registrations before being served with W 108's lawsuit in New York State Court and before filing its own breach of contract action against Defendants in New York State Court." (Pl.'s Mem. 25.)  Thus, Plaintiff argues, it "should not be penalized for enforcing its intellectual property rights—especially where Plaintiff has a good faith belief that Defendants copied the core elements of its design."  (*Id.*)

A court in this district has previously cited "the leveraging of a settlement" as an improper motivation.  *Torah Soft Ltd. v. Drosnin*, No. 00-CV-5650, 2001 WL 1506013, at *5 (S.D.N.Y. Nov. 27, 2001).  Defendants, however, put forward no evidence to substantiate their claim that Plaintiff sought to use this litigation to leverage a settlement in the state proceedings. Absent evidence to that effect, the Court cannot countenance this argument.

Moreover, Defendants cite *Boesen*, which itself relies on *Torah Soft* as the lone case in which "leveraging of a settlement" was the grounds on which a court in this district found improper motivation.  (Defs.' Reply Mem. 10 (citing *Boesen*, 2021 WL 1145730, at *3).) However, in *Torah Soft*, the plaintiff did "not explain[] . . . its purpose in advancing the copyright claims at all" and was "inconsistent" with related contract claims brought in state court.  2001 WL 1506013, at *5.  The same cannot be said here, where Plaintiff's desire to vindicate its copyright claims are both evident and in line with its underlying state court contractual litigation.  "To allow fees on this basis would be to deter the exercise of rights afforded to litigants in federal court."  *Matthew Bender*, 240 F.3d at 126; *cf. Dow Chem. Pac.*

*Ltd. v. Rascator Mar. S.A.*, 782 F.2d 329, 344 (2d Cir. 1986) (noting, though not in the copyright context, that an award of attorney's fees should not "deter persons with colorable claims from pursuing those claims").

Relatedly, "there [is] no evidence that [Plaintiff's] decision to file the [federal] suit was . . . in bad faith" because the action at issue "was not the subject of the [state] suit." *Leonard v. Stemtech Int'l Inc.*, 834 F.3d 376, 403 (3d Cir. 2016) (quotation marks omitted). Plaintiff's contractual rights and the rights in its copyright are altogether distinct, and because they were distinct, this Action would be improperly view as "an end-run around" the state court litigation. *Id.* (quotation marks omitted).

Defendants are not wrong to argue that Plaintiff's failure to make a pre-filing demand on Defendants could be viewed as evidence of bad faith in light of apposite precedent in this district. (Defs.' Reply Mem. 10 (citing *Boesen*, 2021 WL 1145730, at *4).) Nor are Defendants entirely wrong in thinking that there are a few curious facts that could raise eyebrows regarding Plaintiff's motivation, including Plaintiff's decision not to sue Coogan, Plaintiff's failure to remove the plans from the DOB website, and the timing of Plaintiff's litigation vis-à-vis when Plaintiff pursued copyright protections. However, the latter curiosities could be explained. For example, Plaintiff's pre-existing and continuing work and professional relationship with Coogan, (*see* Pilla Tr. 161:2–163:16), may well explain its choice not to sue Coogan.

But in light of the fact that "a court does not need to apply a specific standard" when awarding fees under the Copyright Act, *EMI Mills Music, Inc. v. Empress Hotel, Inc.*, 470 F. Supp. 2d 67, 76 (D.P.R. 2006), the Court concludes that these considerations do not rise to the level of bad faith. Examples elsewhere serve as useful highwater marks. Courts have awarded fees in copyright actions because the plaintiff failed to "initiate[] any discovery whatsoever,"

59

thereby evincing "a bad faith attempt" to "harass" a party and force them "into extremely costly litigation" rather than vindicate any rights purportedly violated.  *NLFC, Inc. v. Devcom Mid-Am., Inc.*, 916 F. Supp. 751, 759–60 (N.D. Ill. 1996).  Elsewise, a court has viewed "contradictions, elisions, and omissions in [the] [p]laintiffs' papers" as evidence of improper motivation.  *Cass Cnty. Music Co. v. Khalifa*, 914 F. Supp. 30, 35 (N.D.N.Y. 1996), *aff'd*, 112 F.3d 503 (2d Cir. 1996).  The comparatively little evidence of bad faith again weighs against awarding attorney's fees and costs to Defendants.

c.  Deterrence

Finally, Defendants reprise their argument as to Plaintiff's bad faith in initiating this lawsuit, asserting Plaintiff did so "as a litigation strategy and tactic to pressure settlement in the State Court action" and that an award of attorney's fees would deter future litigants from undertaking such a course of conduct.  (Defs.' Mem. 13.)  Defendants' logic falls short.

Plaintiff is unlikely a repeat player, as this Action concerned one specific set of architectural drawings.  As such, "[t]he case for specific deterrence is particularly [weak] here," as the Court is not aware that Plaintiff has brought similar claims in the past and finds it unlikely that Plaintiff will do so in the future.  *Cf. Latin Am. Music Co. v. Spanish Broad. Sys., Inc.*, No. 13-CV-1526, 2020 WL 2848232, at *4 (S.D.N.Y. June 1, 2020) ("The case for specific deterrence is particularly strong here, since [the] [p]laintiffs have brought several similar claims in the past."); *see also Mallon v. Marshall*, 268 F. Supp. 3d 264, 267 (D. Mass. 2017) (refusing to award fees under 17 U.S.C. § 505 because, inter alia, "[t]here is no reason to believe that [the plaintiff] is likely to file a series of similar suits if he is not punished by fee-shifting").

Moreover, declining to award a prevailing defendant costs and attorney's fees in this action "is in harmony with other fee awards in copyright cases," *Beastie Boys v. Monster Energy*

60

*Co.*, 112 F. Supp. 3d 31, 59 (S.D.N.Y. 2015), when the copyright at issue is architectural designs, *see Sari*, 129 F. Supp. 3d at 335 (declining to award attorney's fees and costs to prevailing home design defendant in architectural copyright infringement case); *Dream Custom Homes*, 773 F. Supp. 2d at 1294, 1311 (noting the plaintiff's request for attorney's fees and granting defendants' motion for summary judgment without awarding such fees); *N. Forest Dev.*, 2009 WL 5959961, at *7 (recommending against attorney's fees notwithstanding recommending that defendants be granted summary judgment in their favor in architectural design copyright infringement claim).  Therefore, the Court declines to find that fees are necessary to deter future litigants from undertaking future unreasonable claims.

Having concluded that all four factors weigh against a finding of attorney's fees, the Court will not exercise its discretion to do so here.  The Court's "denial of attorney's fees is not a matter of no harm, no foul; rather, no harm, no foul deserving of any greater penalty than a finding that a foul has been committed." *Love v. Kwitny*, 772 F. Supp. 1367, 1378 (S.D.N.Y. 1991), *aff'd*, 963 F.2d 1521 (2d Cir. 1992).

## III.  Conclusion

For the foregoing reasons, the Court grants Defendants' Motion for Summary Judgment. The Clerk of Court is respectfully directed to terminate the pending Motion, (Dkt. No. 66), enter judgment for Defendants, and close this case.

SO ORDERED.

DATED:      March 29, 2022
            White Plains, New York

_____
KENNETH M. KARAS
United States District Judge